914 A.2d 1265

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–APPELLANT, v. M.M.,
DEFENDANT–RESPONDENT.

IN THE MATTER OF THE GUARDIANSHIP OF M.A.M.

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF, v. C.B., DEFENDANT.

IN THE MATTER OF THE GUARDIANSHIP OF M.A.M.

Argued October 11, 2006—Decided February 8, 2007.

264

*Lauren F. Carlton,* Assistant Attorney General, argued the cause for appellant New Jersey Division of Youth and Family Services (*Stuart J. Rabner,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Carlton* and *Patricia J. O'Dowd,* Deputy Attorney General, on the briefs). *Jane M. Personette,* Designated Counsel, argued the cause for appellant Law Guardian for M.A.M. (*Yvonne Smith Segars,* Public Defender, attorney).

*Beatrix W. Shear,* Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Shear, Ted Gary Mitchell,* Deputy Public Defender and *Alison S. Perrone,* Designated Counsel, on the briefs).

*Mary M. McManus,* argued the cause for amicus curiae, Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Ms. McManus* and *Mr. Miller,* on the brief).

Justice ZAZZALI delivered the opinion of the Court.

In this appeal, we must decide whether the trial court properly terminated a father's parental rights in respect of his son. The son is now four years old and has been in his foster parents' custody since a few days after his birth. The trial court terminated the parental rights of the mother and the father and awarded guardianship to the Division of Youth and Family Services (DYFS or Division). Among other findings, the court concluded that the son was at risk because of the mother's destabilizing influence on the home, a negative influence that must be considered when evaluating the father's rights. The Appellate Division reinstated the father's parental rights but affirmed the termination of the mother's rights. *Div. of Youth & Family Servs. v. M.M.,* 382

*N.J.Super.* 264, 283–84, 888 *A.*2d 512 (App.Div.2006). We granted certification to review the termination of the father's rights only. 186 *N.J.* 606, 897 *A.*2d 1060 (2006).

The record contains clear and convincing evidence that the father did not establish a safe and stable environment for his son. Although the father does not pose a direct threat to his son, the evidence demonstrates that he did not provide for the son's special needs or mitigate the effects of the harmful environment in which he intends to raise the son. Additionally, since the son's placement in foster care a few days after his birth, he has developed strong emotional bonds with his foster parents and, with their assistance, is overcoming various muscular and neurological disorders. Conversely, the father has had ample opportunity to improve the circumstances, but his efforts are both untimely and inadequate.

The standard for the determination of this appeal is the best-interests-of-the-child. In the tapestry of facts that we now detail, one common thread emerges—it is not in the son's best interests to remove him from a home where he has flourished and place him in an environment that is, at best, destabilizing. Because we defer to, and agree with, the trial court's holding that termination of the father's rights is in the son's best interests in this unique case, we reverse.

I.

A.

Respondent, M.M., is the biological father of M.A.M., the child at issue. M.M. resides in Dover, New Jersey with C.B., M.A.M.'s biological mother.[1] The mother is thirty-two years old, and the

---

[1] The Appellate Division referred to the parties by their initials, which is a common practice. Because the use of initials can confuse readers, particularly when there are several parties, we will refer to M.M. as the "father," M.A.M. as the "son," and C.B. as the "mother." Additionally, we will refer to the couple's

father is sixty-years old. The mother and father have been together for more than fifteen years and are not married. They have one other biological child together, a daughter born in 1993, who also lives in the home. The father's parental rights concerning the daughter are not at issue in this appeal.

Within days of the son's birth in 2003, DYFS became involved. The initial DYFS referral noted that the mother had poor hygiene, appeared overwhelmed caring for the newborn, and needed constant direction. The son was hypoglycemic at birth and required regular feedings every three hours because a drop in his glucose levels could result in seizures. A nurse observed that the mother was unable to calculate the son's feeding times. Additionally, the son has a variety of developmental disorders that were likely caused by overexposure to alcohol in utero and that require special therapy.

Concerned about the mother's ability to care for her son, the Division questioned the father regarding his plans for the son once the baby was released from the hospital. The father stated that he intended to bring the mother and his son to work with him every day at his drycleaning job. When DYFS informed him that his plan was unacceptable, he offered a list of relatives that could provide daycare. The Division found, however, that all the listed caregivers were also under investigation by DYFS or were unwilling to provide the needed assistance. Accordingly, sixteen days after the son's birth, the Division placed him with his foster parents. Since then, the foster parents have cared for the son, who is now four years old. The Division filed a complaint in 2004, petitioning the court for guardianship of the son for the purpose of adoption.

### The Mother

At trial, several witnesses expressed concerns about returning the son to his father's care because of the mother's presence in the

---

older daughter, S.M., as the "daughter" and the foster father, R.B., as the "foster father."

home. All the psychological experts agreed that the mother posed a risk to the son. Dr. Frank Dyer, a psychologist testifying for DYFS, stated that the mother was "much too cognitively limited and much too immature emotionally ... to be considered a viable caretaker" for the son. In his report, Dr. Dyer noted that the mother's intellectual functioning was "well within the mildly retarded range" and her performance was comparable to that of an average seven-year-old child. The implications of the mother's psychological profile for parenting were also negative. In Dr. Dyer's view:

> [The mother] is much too limited intellectually to be able to appreciate the physical and emotional needs of a young child. She lacks the vigilance, judgment, and common sense to be able to provide adequate physical protection, nurturance, intellectual stimulation, and emotional security for a young child. It is noteworthy that [the mother] agonizes over the fact that she has caused her daughter so much suffering by her pattern of running away from the home to go on alcoholic binges; however, this pattern has persisted until as recently as two months before the present examination. *To a reasonable degree of certainty, a preschool child in [the mother]'s care would be at very great risk of harm.*
>
> [ (Emphasis added).]

The mother's limited mental capacity and erratic tendencies led Dr. Dyer to observe that, at times, the father "experiences the [ ] relationship [with the mother] almost as though he had another child in the home." Dr. Dyer concluded that "the overall behavior impression was that of a mentally retarded woman with poor judgment and poor impulse control." When asked about the mother's prognosis for change, Dr. Dyer stated:

> She did not display any particular insight into her problems. She displayed what I consider to be a rather crude denial system in regard to the possibility of working out her problems, or her own responsibility for the problems involving the family and involving her. She tended not to give any evidence of either an intellectual potential or some kind of motivation to achieve genuine change.

Dr. Ronald Silikovitz, the mother's psychological expert, corroborated Dr. Dyer's findings. Dr. Silikovitz conceded that it was accurate to describe the mother as "mentally retarded" and it would not be in the son's best interests to place him in her physical care. Dr. Paul Fulford, the father's psychological expert, did not evaluate the mother personally but offered an opinion regarding her fitness to parent, stating:

. [The mother] represents a threat of potential [harm] only if allowed sole parenting responsibility, and this must be seen in the light of her mental age, which is child like [sic]. In other words, she would be seen as more of an elder sister to [the son], rather than birth mother, and, as such does not represent a danger in his presence, but only a risk if allowed to assume an exclusive parental role, much the same as a young child would be a risk to an infant sibling, if left in their sole care.

Caseworkers testified that the mother abuses alcohol and often runs away from home to binge drink. The mother's history of running away extends back to her childhood. Since 2003, the Division received numerous referrals regarding that behavior. She ran away on twelve occasions between 2002 and 2005, including at least three specific instances in the months preceding the trial. On one such occasion, she took all the money that the couple had saved to move into a larger home and spent it on alcohol. On another occasion, when pregnant with the son, she admits to running away to visit a man with whom she maintained an illicit affair because she thought he might be the son's father. Although she received treatment for her substance abuse, witnesses testified that her problems are cyclical and that she needs vigilant assistance from others to overcome her addiction. A caseworker at the Family Enrichment Program, a community service organization that provides services to needy families, testified that the family had made no progress towards the goal of family stability. The caseworker recommended that DYFS not return the son to his parents because of the instability created by the mother.

Additionally, experts and caseworkers expressed concern about the mother's tendency to make unsubstantiated allegations of domestic violence against the father. Indeed, she was once arrested for making a false statement to police regarding domestic violence. She also admits to feigning numerous instances of domestic violence to "get attention" and win the sympathy of social workers, and has recanted all of her domestic violence allegations. DYFS independently investigated several of the claims but was unable to substantiate any of the mother's allegations.

### The Father

Viewed independently of the mother, the record presents the father in a more favorable light. Notwithstanding earlier difficulties in his life, the record suggests that the father has overcome a troubled past, is dedicated to his family, and has been drug-free since 1996. He works several jobs and is committed to gaining custody of his son. Dr. Fulford reported that the father has achieved "a measure of stability in his life." Dr. Dyer, the DYFS expert, concurred, stating that the father is "heavily invested in domesticity," is very interpersonally related, and genuinely loves his son. Dr. Dyer summarized his evaluation by noting that "the overall behavioral impression was that of an individual who is functioning within the parameters of psychological normality."

In respect of the father's fitness to parent, Dr. Fulford observed that the father "is a capable and responsible parent, who would be able to assume a custodial parenting role for his son." He further explained:

> [The father is] employed, he's independent, [and] he's affectionate with his son. The record indicates that his daughter is being raised successfully, so that speaks to [his] track record as a parent. He is bonded to his child, the child is bonded to him. And, as such, he would appear to be appropriate as a parent for custody.

Similarly, Dr. Dyer stated that the father would be capable of appropriately parenting his son. He emphasized, however, that the son's attachment to his foster family and the father's inability to stabilize the mother militated against placing the son with his biological father. Dr. Dyer noted that the father has "failed miserably" in his attempts to "dissuade [the mother] from this pattern of abandoning the home and going out to consume alcohol, [and] gaining entry to shelters by claiming to be a victim of domestic violence." In Dr. Dyer's view, the father's inability to stabilize the mother was a "fatal obstacle" to raising a young child.

The father has complied with all Division requirements for reunification with his son, including attending parenting classes and visitation. Nevertheless, he remains deeply committed to the mother notwithstanding the risk that she poses to their son, and the couple remains together. The father told Dr. Dyer that he

loves the mother despite the fact that she is mentally retarded. He is resentful of the Division because he believes that DYFS workers tried to manipulate the mother, encouraging her to leave him so that he could gain custody of his son.

## The Daughter

The Division first became involved with the mother and father in 1993, prior to the birth of their daughter. The Association for Retarded Citizens referred the family to the Division, alleging that the couple presented a risk to their unborn daughter because of domestic violence and substance abuse. DYFS investigated and concluded that the allegations were unsubstantiated. At that time, the father was under house arrest and was subject to random drug and alcohol testing. Subsequent DYFS reports stated that the mother cooperated with her prenatal appointments and was prepared for her unborn child. After the daughter's birth, however, the mother made several allegations of domestic violence against the father, all of which she recanted.

In 1994, the daughter received emergency medical treatment for a burn mark on her upper arm that may have been caused by someone using her to extinguish a cigarette. She was also treated for swelling to the forehead and a scraped lip. She was eventually released to the father, who was to be the primary caretaker. The Family Part of the Superior Court subsequently issued an order that the daughter was never to be alone with her mother, and the DYFS case plan had included a similar restriction. During that period, the mother ran away from home on numerous occasions for weeks at a time. Additionally, in 1999, DYFS investigated an allegation that the daughter was in danger because the couple could not afford food. The Division concluded that the family was experiencing financial difficulties but that the daughter was not at risk.

Dr. Dyer was the only expert witness to evaluate the daughter. The daughter performed adequately on an intelligence test administered by Dr. Dyer, and Dr. Dyer assessed her intellectual functioning to be in the "lower extreme of the average range."

The daughter stated that she enjoys school and that she has many friends. Dr. Dyer concluded that the father is adequately parenting her. Although Dr. Dyer found that the daughter was not abused or neglected, he noted that the instability created by the mother caused her harm. He stated that the daughter experienced parental abandonment on several occasions and a food shortage in the home when the family faced financial difficulties. He explained that the daughter worries about the family's stability and appears to believe that if she behaves and does "her part," the family's situation will improve. Although she expresses concerns about her mother's ability to care for her brother, she is protective of her parents. Dr. Dyer concluded that leaving the daughter in the home has had "far-reaching effects psychologically on [the daughter]." Finally, according to three social workers, the daughter conveyed to her father that "she did not want her mother home because she doesn't want her brother to go through what she has gone through."

### The Foster Parents

As noted, the son, who is now four years-old, has been cared for by a foster family since he was sixteen days-old, virtually his entire life. The foster father testified that he and his wife became foster parents after learning that they could not have children of their own. He stated that they would adopt the son "without question" if presented with the opportunity and that they "love [the son] to no end." The foster father explained that the son has various special needs and is receiving physical therapy because of a muscular disorder and speech therapy due to verbal apraxia, a speech impediment. Additionally, the foster father described numerous, tedious exercises that he and his wife perform with the son to help him overcome those disorders. The son is not currently enrolled in daycare, but the foster father explained that he and his wife were considering sending him to daycare two days a week. The foster parents are supportive of continued visitation for the father and daughter but object to visitation by the mother. Finally, the foster father stressed that after visiting with the

mother, the son is noticeably upset and often acts out violently against his foster mother.

## The Son

Although the essential facts concerning the son have already been noted, a few points deserve emphasis. First, the son is a child with special needs. At birth he had a heart murmur and was hypoglycemic. According to the foster mother, those conditions have "cleared up." However, he continues to suffer from various developmental disorders and is in need of surgery to correct a herniated navel. Additionally, the cause of his speech disorder has been diagnosed as neurological in nature, requiring further attention from a neurologist. The son also suffers from a muscular disorder that requires someone to assist him in performing various mechanical exercises. Those efforts include carefully massaging his facial muscles; using specialized whistles to develop his jaw and lips; and training him to drink with customized straws to help him with tongue placement. The foster family has assumed responsibility for all of those special needs.

Second, only the DYFS expert, Dr. Dyer, evaluated the son individually and assessed his general development. According to Dr. Dyer, the son's self-help skills and motor skills are "low average" and "his language development and social maturity are borderline." Dr. Dyer reported that the son's "overall developmental quotient" was "within the borderline range." He concluded, however, that "in light of his genetic background and the possibility of exposure to large amounts of alcohol in utero," the son is "developing adequately" under his foster family's care.

## Expert Bonding Evaluations

Both Dr. Dyer and Dr. Silikovitz conducted bonding evaluations between the son and his biological parents, and the son and his foster parents. Dr. Dyer observed the son in a "free play session" with both of his biological parents for approximately forty-five minutes. The same evaluation took place with the foster parents. Dr. Dyer found that the son's "central love object" is his foster mother and that "he is profoundly attached to his foster parents."

Dr. Dyer observed that although the son displays avoidant behavior towards his biological mother, he is affectionate and responsive to his biological father. He concluded that the son would suffer significant harm if separated from his foster family. Furthermore, Dr. Dyer emphasized that the son's positive relationship with his biological father would not be able to compensate for the significant loss that the son would experience if separated from his foster parents. According to Dr. Dyer, if the son is separated from his foster family he would "suffer a traumatic loss [and] an inability or impairment in his capacity to form future attachments, that he would suffer impaired self-esteem, his basic trust would be affected, and his set of expectations for future intimate relationships would be distorted."

Dr. Silikovitz, the mother's psychological expert, reached a similar conclusion. Dr. Silikovitz concluded that in view of the bond between the son and his foster family "it is likely that he might suffer severe and enduring emotional harm if removed from his foster parents." Dr. Silikovitz also observed that the son displayed avoidant behavior towards his mother by refusing to hug her on several occasions. Although he made no objection to the father being a parent, Dr. Silikovitz cautioned that "because this psychologist has not evaluated [the father] it would be beyond the scope of this evaluation to make a recommendation regarding the appropriateness of placing [the son] in the primary care of [the father.]" Additionally, he expressed concern because it would be very difficult for the father to protect his son from the mother.

Only Dr. Fulford, the father's expert, was of the opinion that the son would not suffer severe and enduring harm if separated from his foster family. Without the mother present, Dr. Fulford conducted a bonding evaluation between the son and the father. Dr. Fulford perceived that the father was "attentive, affectionate, and appropriate with his son." He concluded that a mutual bond existed between the father and the son.

Dr. Fulford cautioned, however, that he was at a disadvantage in offering an opinion because he had not evaluated the mother or

the daughter. Specifically, Dr. Fulford stated that he could provide only hypothetical opinions regarding family dynamics because he had not evaluated all the family members and had not observed the son in the presence of the mother or the daughter. His recommendation was exclusively based on the interaction between the father and the son. Dr. Fulford stated that the son "is bonded to both his birth father and foster parents" and, therefore, "separating [the son] from his foster family would not subject him to permanent and irreparable harm."

## B.

The Division filed a verified complaint in January 2003 requesting custody of the son. The trial court awarded guardianship to DYFS and the son was placed directly in foster care on January 23, 2003, when he was released from the hospital at sixteen days-old. In February 2004, the mother missed her scheduled visitation because she had run away from home. Consequently, the Division filed a complaint in April 2004, requesting guardianship of the son for purposes of adoption. At trial, a court-appointed Law Guardian appeared on the son's behalf.

In May 2005, the trial court rendered an oral decision terminating the parental rights of both the mother and the father. The determinative factor for the trial court was that "the parents' rights have to be viewed in light of what's in the best interest[s] of the child." The court concluded that it was in the son's best interests to remain with the foster family because of the bonds that he had developed with his foster parents and because of the "repeated destabilizing elements" created by the mother.

Both the mother and the father appealed the termination of their parental rights. DYFS and the Law Guardian filed briefs in opposition to reinstatement of those rights. The Appellate Division upheld the trial court's termination of the mother's rights but reinstated the father's rights, disagreeing with the trial court's judgment as a matter of law because "one parent cannot be held responsible for the shortcomings of the other." *M.M., supra,* 382

*N.J.Super.* at 282–84, 888 *A.*2d 512. The mother petitioned this Court for certification. DYFS and the Law Guardian filed a petition for cross-certification, contending that termination of the father's rights is in the son's best interests. We granted certification as to the father's rights only. 186 *N.J.* 606, 897 *A.*2d 1060 (2006). We also permitted Legal Services of New Jersey to file a brief as amicus curiae.

## C.

Because the son has remained in the legal and physical custody of the Division during the pendency of this appeal, the son's welfare remains subject to judicial oversight. *See N.J.S.A.* 30:4C–53; *R.* 5:12–4. Consequently, in June 2006, after we granted certification, the son's case was subject to a judicial "Case Management Review." Pursuant to that review, the trial court ordered the son to remain in DYFS custody subject to a "Compliance Review" scheduled for September 21, 2006. The court also ordered the father to prepare a "Parenting Plan" to be submitted at the September 21 hearing. The father forwarded that parenting plan to this Court as evidence of changed circumstances after the trial court terminated his parental rights. Specifically, the father argues that he now has a viable daycare plan for the son and he can ensure that the son will not be left alone with the mother. Our scope of review, however, is limited to whether the trial court's decision is supported by the record as it existed at the time of trial. *R.* 2:5–4 (scope of record on appeal); *see e.g.,* *Middle Inspection Agency v. Home Ins. Co.,* 154 *N.J.Super.* 49, 56, 380 *A.*2d 1165 (App.Div.1977) (refusing to consider evidence improperly submitted at appellate level). Accordingly, we do not consider the father's evidentiary submissions and our review is based on the trial record. *See R.* 2:5–4.

## II.

### A.

Review of a trial court's termination of parental rights is limited. *See In re Guardianship of J.N.H.,* 172 *N.J.* 440, 472, 799

A.2d 518 (2002). A reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by "adequate, substantial and credible evidence" on the record. *In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 188, 634 A.2d 1361 (App.Div.1993) (internal quotation marks and citations omitted); *accord In re J.N.H, supra*, 172 *N.J.* at 472, 799 A.2d 518. Additionally, as a general rule, we must grant deference to the trial court's credibility determinations. *See Cesare v. Cesare*, 154 *N.J.* 394, 411–13, 713 A.2d 390 (1998). However, " 'where the focus of the dispute is ... alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' the traditional scope of review is expanded." *In re J.T., supra*, 269 *N.J.Super.* at 188–89, 634 A.2d 1361 (quoting *C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc.*, 233 *N.J.Super.* 65, 69, 558 A.2d 28 (App.Div.), *certif. denied*, 117 *N.J.* 165, 564 A.2d 883 (1989)). Still, even in those circumstances we will accord deference unless the trial court's findings "went so wide of the mark that a mistake must have been made." *Snyder, supra*, 233 *N.J.Super.* at 69, 558 A.2d 28 (quoting *Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 *N.J.Super.* 332, 338, 382 A.2d 933 (App.Div.1978)).

### B.

Parents have a constitutionally protected right to maintain a relationship with their children. *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 346, 736 A.2d 1246 (1999) (citing *Stanley v. Illinois*, 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558–59 (1972)). We recognize and honor the fundamental nature of that right and consistently impose "strict standards for the termination of parental rights." *Id.* at 347, 736 A.2d 1246. Parental rights are not absolute, however. *See In re K.H.O., supra*, 161 *N.J.* at 347, 736 A.2d 1246. The State has a responsibility to protect the welfare of children and may terminate parental rights if the child is at risk of serious physical or emotional harm. *See Parham v. J.R.*, 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979).

The statutory best-interests-of-the-child standard aims to achieve the appropriate balance between parental rights and the State's *parens patriae* responsibility. *See N.J.S.A.* 30:4C–15.1(a); *N.J. Div. of Youth & Fam. Servs. v. A.W.,* 103 *N.J.* 591, 604–11, 512 *A.*2d 438 (1986). Under that standard, parental rights may be terminated only when:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

Those "four elements of the best interests test overlap and provide a comprehensive standard for deciding what is in a child's best interest." *N.J. Div. of Youth & Family Servs. v. S.V.,* 362 *N.J.Super.* 76, 84, 826 *A.*2d 821 (App.Div.2003). They "are neither discrete nor separate. They overlap to provide a *composite picture* of what may be necessary to advance the *best interests* of the children." *N.J. Div. of Youth & Family Servs. v. F.M.,* 375 *N.J.Super.* 235, 259, 867 *A.*2d 499 (App.Div.2005) (emphasis added). "[T]hey are designed to identify and assess what may be necessary to promote and protect the best interests of the child." *N.J. Div. of Youth & Family Servs. v. R.L.,* 388 *N.J.Super.* 81, 88, 906 *A.*2d 463 (App.Div.2006). The considerations involved "are 'extremely fact sensitive' and require particularized evidence that address the specific circumstance in the given case." *Id.* at 348, 906 *A.*2d 463 (quoting *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 139, 631 *A.*2d 928 (1993)). The Division bears the burden of proving by clear and convincing evidence that the four statutory criteria are satisfied. *See N.J. Div. of Youth & Fam. Servs. v. P.P.,* 180 *N.J.* 494, 511, 852 *A.*2d 1093 (2004).

Under the first prong of the best-interests standard, "the harm shown ... must be one that threatens the child's health and will likely have continuing deleterious effects on the child." *In re K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246. The State can satisfy the second prong if it can show "that the child will suffer substantially from a lack of stability and a permanent placement and from the disruption of [his or] her bond with foster parents." *In re K.H.O., supra,* 161 *N.J.* at 363, 736 *A.*2d 1246. Under the third prong, DYFS must make reasonable efforts to provide services to help the parents correct the circumstances that led to the child's placement outside the home. *N.J.S.A.* 30:4C–15.1(a)(3). "Reasonable efforts" may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation. *See N.J.S.A.* 30:4C–15.1(c). Finally, to satisfy the fourth prong, the State should offer testimony of a "well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation" of the child's relationship with both the natural parents and the foster parents. *In re J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312. A child's need for permanency is an important consideration under the fourth prong. *See In re K.H.O., supra,* 161 *N.J.* at 357–58, 736 *A.*2d 1246.

### III.

We now consider whether there was sufficient evidence on the record to support the trial court's termination of the father's rights.

### A.

Under the first prong of the best-interests standard, the court must determine whether the "child's safety, health or development has been or will continue to be endangered by the parental relationship." *N.J.S.A.* 30:4C–15.1(a)(1). We find that the record is replete with evidence that justifies the trial court's

conclusion that the father failed to provide a home in which the son was not in constant danger. Although we are mindful of the mother's limitations, it is the father who established the dangerous situation at home, who maintains those conditions, and who is unable or unwilling to substantially alter those conditions.

The mother's presence in the home creates an unstable environment and poses a serious risk to the son because of her substance abuse problems, habitual running away from home, and history of falsely alleging domestic violence. Dr. Dyer testified that those actions were a "fatal obstacle" to the development of a young child and that the mother's behavior has had "far-reaching" psychological effects on the family. All experts agreed that the mother's cognitive limitations also pose a risk to the son. Dr. Dyer characterized the risk as "extreme," and Dr. Fulford, the father's expert, analogized the mother's parenting skills to those of a "young child." Indeed, the father concedes that the mother should not be left alone with the son. The Law Guardian also noted that the mother "cannot now or at any time in the future be considered as a caretaker for" the son. In short, the evidence demonstrates that the mother is a danger to the son both when she remains at home and when she runs away from home.

Although it was imperative that the father provide a daycare plan that could guarantee that the son would not be left alone with the mother, he did not provide a suitable plan under the circumstances. His initial proposal to take his new-born infant to work with him at a dry-cleaning facility with all of its attendant dangers was, as DYFS concluded, unacceptable. We recognize that the father subsequently suggested various individuals who could care for the son during the day. However, two of those individuals were deemed unacceptable because DYFS was currently investigating their fitness to care for children already in their custody. When DYFS investigated the other individuals, it discovered that some of them had not yet been contacted by the father. Even the father's sister, whom DYFS contacted at the father's request, told DYFS that she was uncertain about assuming such a significant

responsibility. She never provided DYFS with a clear answer, refusing to return the caseworker's telephone calls. Finally, the father claims that he identified a viable state daycare center. But when DYFS investigated that possibility, it discovered that the center could not assure the son's placement because the center had limited enrollment. Stated simply, the father's daycare plan could not protect the son from the harmful home environment that he maintained.

The father nonetheless contends that he can guarantee an adequate daycare plan for the son and that he is aware of the risks associated with leaving the son in the mother's care. Yet the father, no matter how well-intentioned, left the daughter in the sole care of the mother on at least five occasions notwithstanding the DYFS case plan to the contrary. DYFS case reports documenting those five instances were included in the trial record, and, therefore, the trial court had good cause to reject the father's assertions given the circumstances described above including his failure to comply with the prior case plan. The dangerous nature of the father's home environment required the father to provide a solid daycare plan. He did not do so.

B.

The second prong requires the trial court to evaluate whether the parent is "unable or unwilling to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child," and whether a delay in permanent placement would add to the harm. *N.J.S.A.* 30:4C–15.1(a)(2). The evidence establishes that the father is unable to protect the son. Dr. Dyer predicted that the mother's destructive tendencies would continue and that the father would not be able to provide a safe environment for the son. Several caseworkers also testified that the family has made no progress towards the goal of family stability. Similarly, the Law Guardian, who is the person charged with the duty to protect the welfare of the child, maintains that the father failed to stabilize his home.

Additionally, the father's testimony at trial suggests that he does not fully appreciate the needs of his infant son or the risks created by the mother's presence in the home. He testified that DYFS had no reason to take the "son in the first place because there was nothing that [the mother] did and there was nothing that [he] did. All DYFS brought up [were] allegations of something ten years ago, fifteen years ago." The father also defended his plan to take his sixteen-day-old son to work with him at the drycleaner, insisting that the son would be perfectly safe because "the environmentals [sic] come[ ] around to check the cleaning of the clothing, to check odor in the air, to check everything." He also guaranteed that the mother "will never be left alone with either child." Yet, on cross examination, he admitted that the mother may have been left alone with the daughter notwithstanding a DYFS case plan to the contrary. Although the father appears to have overcome his troubled past, he does not appreciate the extraordinary difficulties of raising the son in the same home as the mother. The father's contentions highlight his questionable judgment and reveal his inability to exercise the prudence necessary to protect the son from the mother's harmful presence.

The father argues that the daughter's healthy development evidences his ability to mitigate the domestic instability created by the mother. However, the experts disagree as to the extent of the harm suffered by the daughter. Although Dr. Fulford's opinion corroborates the father's claim, Dr. Dyer concluded that leaving the daughter in the home was psychologically detrimental to the daughter. Dr. Dyer further emphasized that the daughter's development was not a fair gauge of the son's potential development if placed with the father because the son has special needs, unlike the daughter. The trial court found Dr. Dyer's analysis to be the most credible and found that the daughter's position was distinguishable from the son's circumstances. That conclusion is substantiated by the fact that only Dr. Dyer evaluated all family members and, therefore, he was best situated to make a comparative analysis of the daughter and the son.

Additionally, DYFS caseworkers testified that the arrival of a second child would dramatically increase the demands on the father particularly because the mother cannot provide much assistance. The caseworkers expressed concern that the father would be unable to sustain multiple jobs, stabilize the mother, parent the daughter, and care for the son. The daughter's development, therefore, is not an accurate barometer of the potential harm to the son and the trial court properly concluded that the father could not provide a suitable home for the son.

Further, the trial court found that "a delay in permanent placement will add to the harm." The expert evaluations established that the son has developed strong bonds with his foster parents and is fearful of his biological mother. Removing the son from his foster family would destroy any sense of permanency and further harm him. The trial court properly considered the harm caused by removing the son from his foster parents. While the father has failed to create a stable and suitable home for the son, the son has developed strong bonds with his foster family and matured under their care. Indeed, there was no evidence that the father's situation was improving or would be improved at any point in the future. There was significant evidence on the record to support the conclusion that the son would suffer harm by a loss of permanent placement.

### C.

In respect of the third prong, the trial court must consider whether DYFS has made "reasonable efforts to provide services to help the parent correct the circumstance which led to the child's placement" and whether there are "alternatives to termination of parental rights." *N.J.S.A.* 30:4C–15.1(a)(3). The trial court found that DYFS provided an array of services aimed at family reunification. Those services included the provision of the Department of Developmental Disability's assistance, the coordination of clinically observed visitation and bi-weekly in-home visitation, referrals to outreach programs that provided counseling, and parenting

classes. The record also reveals various contact sheets and case reports monitoring the family's progress.

The father argues that DYFS failed to make reasonable efforts in helping him find suitable daycare. Although not a perfect model, the record demonstrates that DYFS met the third prong. The Division thoroughly investigated each person suggested by the father as a viable daycare provider. All of those individuals were either unable to provide daycare or were unfit because they had a history of involvement with the Division. Additionally, DYFS independently investigated a homemaker service but found that it was unavailable in the county where the father resided. At trial, DYFS caseworkers testified that the father provided contact information for a daycare center that was willing to accept the son. The caseworker confirmed that the center had been willing to accept the son, but because of limited enrollment, the center was no longer able to accommodate the son. The trial court concluded that those efforts satisfied the third prong.

The Division's efforts at reunification were reasonable under the circumstances. DYFS carefully monitored the family's progress, developed a case plan, referred the couple to community services, and attempted to enlist the family's support. Although parents always can argue that DYFS should have done more, the third prong is satisfied in this appeal, and the Division's assistance passes muster, because of the services provided and the various efforts that were expended in an attempt to find suitable daycare.

## D.

The fourth prong directs the trial court to assess whether termination of parental rights will do more harm than good. *N.J.S.A.* 30:4C–15.1(a)(4). It is undisputed that the foster parents have provided a stable, loving environment for almost the son's entire life. He is deeply attached to both foster parents and is overcoming significant developmental disorders because of their diligent attention. They intend to adopt the son if given the opportunity, resulting in a secure and permanent placement for

the son. They also have pledged their willingness to permit continued visitation for the father and the daughter after adoption. Conversely, the father has not eliminated the harm that originally prompted the son's removal. The mother still resides in the home, and the father does not offer a viable plan for protecting the son from the mother's destructive behavior. Nor does the father have the time or the resources to meet the son's special needs. Although the father attempts to address some of those concerns in his most recent parenting plan, that plan is untimely and inadequate, as we explain below.

In respect of the expert testimony, both Dr. Dyer and Dr. Silikovitz testified that the son would suffer severe harm if returned to the father. Dr. Fulford was the only expert to suggest that the son would not suffer severe harm if removed. Because Dr. Fulford did not evaluate either the mother or the daughter, the trial court was justified in giving greater weight to the testimony of Dr. Dyer and Dr. Silikovitz, the only experts to evaluate the entire family.

The trial court therefore concluded, and we agree, that the son has a "significant bond with the foster parents and it would be ... doing more harm than good to cause that traumatic harm [of removal] to the child." The expert testimony and the facts of this appeal support that conclusion. Separating the son from his foster parents would expose the son to the dangers and instability of the biological parents' home, subject him to the loss of the many services provided by the foster parents, and disrupt any permanency in his life.

Finally, as the trial court found, "there has been more visitation in this case than in most cases." And so, although the domestic environment proposed by the father is not in the son's best interests, it is important that the son retain contact with his father and sister, who do not individually present a risk to the son. We "take the foster parents at their word and expect that, as they have promised, they will provide [the son] such opportunities to visit with [the father] and his natural sibling[ ] as are necessary to

his continued welfare and happiness." *In re J.N.H., supra,* 182 *N.J.* at 31, 860 *A.*2d 923. Integral to our analysis under the fourth prong, therefore, is the foster parents' willingness to permit continued visitation by the father and the daughter.

## IV.

We now consider a miscellany of legal arguments advanced by the father and Legal Services of New Jersey.

### A.

The father contends that the trial court erred because, viewed independently of the mother, he is fit to parent and has not personally harmed the son. The father cites cases from other jurisdictions declining to terminate one parent's rights simply because the other parent is unfit. *See, e.g., In re Doe,* 123 *N.H.* 634, 465 *A.*2d 924, 930–31 (1983) (holding that one parent's conduct will not be imputed to other parent "merely because of the marital relation," but finding termination to be proper if parent cannot provide safe home for child); *see also N.J. Div. of Youth & Fam. Servs. v. F.M.,* 375 *N.J.Super.* 235, 259, 867 *A.*2d 499 (App.Div. 2005) (holding that courts must "engage in [a] separate analysis of the facts" for each parent). The Appellate Division agreed with the father and held that the trial court erred as a matter of law because "one parent cannot be held responsible for the shortcomings of another." *M.M., supra,* 382 *N.J.Super.* at 282, 888 *A.*2d 512.

To be sure, termination of one parent's rights is not appropriate merely because the other parent is unfit or has surrendered his or her rights. *See N.J.S.A.* 9:2–15; *In re Doe, supra,* 465 *A.*2d at 930–31. Parental rights are individual in nature and due process requires that fitness be evaluated on an individual basis. *See In re Doe, supra,* 465 *A.*2d at 930–31; *F.M., supra,* 375 *N.J.Super.* at 259, 867 *A.*2d 499 (holding that individual factual analysis is necessary). That said, the conduct of one

parent can be relevant to an evaluation of the parental fitness of another parent. The determinative issue is whether the circumstances surrounding the parental relationship, including any relationships with third-parties, cause harm to the child. *See In re J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312 (holding that relevant inquiry is not whether parent is fit but whether parent can cease causing harm to child). A parent is unfit if he or she is unable or unwilling to prevent harm to the child irrespective of the source of the harm. *See N.J.S.A.* 30:4C–15.1(a)(2); *see, e.g., In re Guardianship of R.G.L.,* 344 *N.J.Super.* 418, 438–39, 782 *A.*2d 458 (App.Div.2001) (holding that termination of parental rights was appropriate even though parents were morally blameless because parents' mental deficiencies put child at risk), *certif. denied,* 171 *N.J.* 44, 791 *A.*2d 222 (2002).

The harm caused by circumstances attendant to the parent-child relationship is as pertinent as any harm caused directly by a parent. *See, e.g., In re R.G.L., supra,* 344 *N.J.Super.* at 439–40, 782 *A.*2d 458 (finding that parents' mental deficiencies were appropriate grounds for termination of parental rights because parents could not provide adequate care). That is, the harms need not be inflicted by the parent personally. *See S.V., supra,* 362 *N.J.Super.* at 80, 87, 826 *A.*2d 821 (terminating mother's rights because, among other things, she failed to protect children from abuse by her boyfriend and failed to protect them from witnessing domestic violence against her). Rather, the relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent. *See In re K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246 (citing *A.W., supra,* 103 *N.J.* at 604–10, 512 *A.*2d 438).

Consequently, a parent's association with third-parties may be an appropriate consideration if those associations harm the child. *See S.V., supra,* 362 *N.J.Super.* at 80, 826 *A.*2d 821; *see also N.J. Div. of Youth & Family Servs. v. B.G.S.,* 291 *N.J.Super.* 582, 592, 677 *A.*2d 1170 (App.Div.1996) (holding that mother's refusal to cease cohabitation with abusive boyfriend was appropriate factor in terminating parental rights). The crucial inquiries

are whether the parent's association with others causes harm to the child and whether the parent is unable or unwilling to provide a safe and stable home. That the threat to the child is created by the presence of another parent is irrelevant to the determination of whether the child is at risk.

Accordingly, the trial court was correct when it evaluated the father's parental rights in light of his cohabitation with the mother. The court did not impute the mother's deficiencies to the father without performing an individualized factual analysis. Rather, the court evaluated the father's fitness to parent by considering all relevant circumstances. Because the mother's presence in the home was pertinent to that inquiry, the trial court properly considered that circumstance.[2]

### B.

The father urges us to consider the parenting plan that he submitted to the trial court while this appeal was pending because

---

[2] The dissent relies on the trial court's observation that " 'all the experts ... agreed that [the father] is a competent parent and [a] dedicated parent.' " *Post*, 189 *N.J.* 295, 914 *A.*2d 1287 (2007) (Wallace, J., dissenting). The dissent then concludes that "there is not clear and convincing evidence to establish the four statutory factors that must be found prior to termination of parental rights." *Id.* at 296, 914 *A.*2d at 1287 (Wallace, J., dissenting).

However, although the trial court did comment regarding the testimony of the various experts, the court articulated its own factual finding in respect of the father. The trial court stated: "I do not find that the [father] is disqualified as a parent *by any current active elements of his personality.*" The court nonetheless found that termination was appropriate because the father could not provide a safe and stable home for the son. In certain circumstances, although a parent may not be incompetent because of any "elements of his [or her] personality," as the trial court concluded in this appeal, that parent may nonetheless be unfit because he or she cannot provide a safe environment for the child. *See e.g., S.V., supra,* 362 *N.J.Super.* at 80, 84–85, 826 *A.*2d 821 (finding termination appropriate despite "no evidence of psychiatric illness or substance abuse that would prevent [the parent] from caring for her children"). In the unusual circumstances of this appeal, we recognize that the father does not suffer from any threatening intellectual or psychological limitations. However, we find that the father is unfit because, among other considerations, he cannot provide a safe and stable home for his son.

it contains evidence of his improved circumstances. As we have noted, our review is limited to the record as it existed at the time of trial. Appellants, as a general rule, cannot undermine the ruling of the trial court by submitting additional evidence after trial. *See R.* 2:5–4 (scope of record on appeal).

Additionally, the father did not address the dangers to the son with any sense of urgency. The father has been aware of his son's need for a viable daycare plan since the son was born. At that time, DYFS informed him of the mother's dangerous limitations and the inappropriateness of keeping the son at a drycleaner during the workday. Nevertheless, even at trial, more than two years after his son was removed from his care, the father insisted that his son would be safe at the drycleaners and protected from the mother. He later prepared a revised parenting plan that finally addressed the harms to the son but he submitted it sixteen months after the trial court rendered its decision terminating his parental rights and nearly two-and-one-half years after DYFS filed its complaint. Consequently, the father's delay has contributed to the strong emotional bonds between the son and his foster parents, a natural consequence of the passage of time that is germane to the determination of the son's best interests. *See In re J.C., supra,* 129 *N.J.* at 18–19, 608 *A.*2d 1312.

Although we do not consider the father's belated plan in reaching our decision, we note that the plan's only reference to the son's special needs is a brief statement that the proposed daycare center would make arrangements for speech therapy. The plan does not acknowledge the various home physical therapies required to help the son overcome his developmental disabilities. Because it does not accommodate the son's special needs, the plan is simply "too little too late."

This appeal demonstrates that reunification becomes increasingly difficult with the passage of time because a child may develop bonds with his or her foster family and gain a sense of permanency. *See In re J.C., supra,* 129 *N.J.* at 18–19, 608 *A.*2d 1312. If the father had submitted the parenting plan in a timely manner,

the outcome may have been different. For the guidance of DYFS and parties in the future, therefore, DYFS should communicate a sense of urgency to parents who are attempting to regain custody of their children and that they should present relevant evidence as soon as possible.[3]

## C.

Finally, Legal Services argues that DYFS did not have the authority to retain custody of the son after a May 2003 fitness-and-neglect hearing because the judge did not issue an order finding the father unfit. At that hearing, the court conducted a fitness-and-neglect inquiry pursuant to *N.J.S.A.* 9:6–8.44, which addresses only whether the parent is culpable of neglect or abuse. The court held the mother to be unfit but did not find the father to be unfit.

However, in January 2003, prior to the Title 9 hearing, the trial court issued an order under *N.J.S.A.* 30:4C–12, the best-interests standard, that "removal of the child is necessary to avoid an ongoing risk to the life, safety or health of the child ... [because] [c]ontinuation of residence in the home would be contrary to the welfare of the child." It is well settled that, unlike Title 9 inquiries, a parent's fitness is not the touchstone under the best-interests standard. *See, e.g., In re J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312. Rather, the court is obligated to assess the best interests of the child. Therefore, irrespective of the outcome of the Title 9 hearing, the court had the authority under *N.J.S.A.* 30:4C–12 to retain custody of the child because the child's health and welfare would be at risk if returned to the home. Continued

---

[3] The father also challenges several of the trial court's factual determinations. However, those arguments concern disputed facts and credibility determinations and, after the trial court thoroughly reviewed the record and observed the witnesses, it found in favor of DYFS. We must consider the record and the trial court's determination in view of the comprehensive standard animating *N.J.S.A.* 30:4C–15.1(a)—the best interests of the child. From that vantage point, the record clearly justifies the trial court's ruling.

custody of the son was supported by the facts and authorized under *N.J.S.A.* 30:4C–12, and was consistent with the essential purpose of the best-interests standard—to protect the child.

## V.

We recognize the predicament of the father who is seeking to accommodate all of his loved ones. However, the best interests of the son must take precedence. *See N.J.S.A.* 30:4C–15.1 (defining best-interests standard). As the Law Guardian aptly noted, the son's "health and well-being [are] seriously impaired by the parental relationship and . . . placement of [the son outside of the home] is warranted." The record demonstrates that the separation of the son from his foster parents, who have comprehensively cared for his special needs almost since birth, combined with his return to the unstable and at times dangerous home of his severely-limited biological parents, is not in the son's best interests.

Our case law requires us to defer to the determination of the trial court because it observed the witnesses, weighed their credibility, and had the best " 'feel' of the case." *See State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964). Although this is an unusual matter, the trial court's findings and careful analysis were not "wide of the mark." *Snyder, supra,* 233 *N.J.Super.* at 69, 558 *A.*2d 28. We cannot gamble on the present welfare and future well-being of this four-year-old special-needs child. In this appeal, there is little margin for error.

Because of the unique facts of this appeal, we reverse the Appellate Division's holding in respect of the father's parental rights and reinstate the trial court's award of guardianship to the Division of Youth and Family Services for purposes of adoption. We emphasize that our conclusion is premised, in part, on the foster parents' willingness to allow continued visitation by the father and the daughter.

Justice WALLACE, JR., dissenting.

I respectfully dissent. I agree with the Appellate Division's analysis that the father was a "capable and competent parent," but "he was unable to remedy the pernicious effects of [the mother's] irresponsible conduct on the children." *Div. of Youth & Family Servs. v. M.M.*, 382 *N.J.Super.* 264, 282, 888 *A.*2d 512 (App.Div. 2006). I also agree with the panel's conclusion that there was insufficient evidence to terminate the father's parental rights. *Ibid.* The father was "obliged only to exert reasonably successful efforts to protect the child from the harm inflicted by [the mother]," and the trial court found that the father had done that. *Ibid.*

The standards for termination of parental rights were articulated by this Court in *Division of Youth & Family Services v. A.W.*, 103 *N.J.* 591, 512 *A.*2d 438 (1986). The Legislature subsequently adopted those standards in *N.J.S.A.* 30:4C–15.1. In order to terminate an individual's parental rights, *N.J.S.A.* 30:4C–15.1 requires that the trial court make specific findings that

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child ... and the delay of permanent placement will add to the harm ...;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [*N.J.S.A.* 30:4C–15.1a.]

Parents have a constitutionally protected right to raise their biological children, "even if those children have been placed in foster care." *In re Guardianship of J.C.*, 129 *N.J.* 1, 9, 608 *A.*2d 1312 (1992) (citing *Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982)). Nevertheless, those constitutionally protected rights must be balanced against "the State's *parens patriae* responsibility to protect the welfare of children." *Id.* at 10, 608 *A.*2d 1312. Importantly, "[b]ecause that power involves the State acting in the place of parents, it is limited to situations in

which the [S]tate has demonstrated that the child's parent or custodian is unfit." *Ibid.*

We emphasized in *J.C.* that " '[f]ew forms of state action are both so severe and so irreversible.' " *Ibid.* (citations omitted). In expressing that the State must prove by clear and convincing evidence that the parent is unable or unwilling to eliminate the initial harm and will continue to cause serious and lasting harm to the child, we declared that

> [w]hen the child's biological parents resist the termination of their parental rights, the court's function will ordinarily be to decide whether the parents can raise their children without causing them further harm. In most cases proofs will focus on past abuse and neglect and on the likelihood of it continuing. However, the cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm. The analysis of harm entails strict standards to protect the statutory and constitutional rights of the natural parents. [*Ibid.* (internal citations omitted).]

In the present case, the trial court was faced with the difficult and unusual circumstance of a mother who was unfit due to her sporadic leaving of the home, but a father who was capable of protecting his son from future harm. The trial court found that the evidence demonstrated that the father was a responsible parent and that he adequately provided for the thirteen-year-old daughter who continued to live in the home.[1] Further, there was no question that the father had exercised the visitation allowed and completed the recommended parenting classes. Regarding the father's ability to parent his son, the trial court found that "all the experts, certainly Dr. Fulford and Dr. Dyer and ... Dr. Silikovitz all agreed that [the father] is a competent parent and [a] dedicated parent." Prior to that finding, the trial court read from portions of the Division's expert's report concerning the bonding

---

[1] Subsequent to the hearing, the father provided a written plan that demonstrated his commitment to provide for both his son and daughter, without any involvement of the mother. Generally, we do not look favorably upon evidence that is submitted after a hearing has occurred. However, the grave responsibility this Court undertakes in termination of parental rights cases justifies that, at a minimum, the Court should remand the case to the trial court to consider the father's parenting plan.

assessment between the father and his son, in which Dr. Dyer expressed the following:

> [The father] behaved in an entirely appropriate fashion towards his son, [M.A.M.], during the bonding assessment. [The father] was appropriately nurturing and involved with the child in constructive play activities. He related to [his son] on the child's level and was able to offer him adequate cognitive and language stimulation during the session. It is obvious that [the father] loves this child and that he genuinely desires to have [his son] placed in his care even if it means that he has to shoulder the entire burden with [the mother] completely excluded as a caretaker.

Based on the facts as found by the trial court, I am compelled to conclude that clear and convincing evidence does not exist to establish the four statutory factors that must be found prior to termination of parental rights. The trial court essentially acknowledged that conclusion when it stated that "it's not a clear case and not an easy case," and admitted that "maybe [the court] got it wrong."

The majority opinion disregards the strict standards we impose for termination of parental rights, *see J.C., supra,* 129 *N.J.* at 9, 608 *A.*2d 1312, and focuses on the bonding between the foster parents and the child. However, bonding should not be used "to determine only which set of parents is optimum or even 'better' in some vague social sense, rather than [whether the natural parents are] capable of rearing the child without serious harm." *Id.* at 21, 608 *A.*2d 1312 (citing *In re Baby M.,* 109 *N.J.* 396, 445, 537 *A.*2d 1227 (1988) ("the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights.")).

In regard to the daughter, the majority opinion states that "no matter how well-intentioned, [the father] left the daughter in the sole care of the mother on at least five occasions notwithstanding the DYFS case plan to the contrary." *Ante* at 283, 914 *A.*2d at 1279. However, the trial court never made that factual finding, but rather, the court praised the father's parenting of his daughter. Furthermore, the record reveals that alleged conduct occurred prior to the Title 9 abuse and neglect action in which the trial court found, in its June 25, 2003 order, that the Division had

not shown by a preponderance of the evidence that the father had abused or neglected his daughter. In short, I am in accord with the argument advanced by Legal Services of New Jersey that because the daughter was not abused or neglected, "there is no basis upon which to impute such to her brother."

In any event, there was little or no evidence that the father was unable to protect his son. The majority opinion relies on the rejection by the Division of the father's parenting plan to place the child in daycare because the daycare facility could not hold a space open as the facility did not know when the father would be able to enroll his son. The testimony in this regard is noteworthy. One caseworker testified that she did not recall contacting the daycare provider and a second caseworker testified that when she contacted the daycare provider, she was informed that it had been holding a space open for the father's child for quite some time, but that it was not able to hold it open anymore. Surely, that evidence is insufficient to support the conclusion that the father was unable to find a person or daycare facility to care for his son when he was at work. Tellingly, the record fails to disclose any attempt by the Division to coordinate with the father and the daycare facility to return the child to the father at the time an opening was available.

Essentially, the majority approves the termination of the father's parental rights to one of his children because the Division was not satisfied that an opening in the daycare facility would be available whenever the Division decided to return the child to his father, and as a result, the child bonded with his foster parents. I cannot approve such a result. Unfortunately, the Division never gave the father the opportunity to be a parent to his son, which would have included enrollment in daycare.

I agree with the Appellate Division's reasoning that

the child—almost two-and-one-half years old at the time of trial, and now barely three years old—has bonded with the foster parents, who have done admirably fine work in providing for him and meeting his special needs. But the fact of bonding between foster parents and subject child—even with a proper focus on the best interests of the child—cannot be a surrogate for the showings and proof standard

mandated by statute, without some special showing of substantial and particularized evidence that serious psychological or emotional harm will be inflicted on the child by separating him from the foster parents. *See J.C., supra,* 129 *N.J.* at 17–26, 608 *A.*2d 1312. Here, from the expert opinions in the case, we discern no such harm that will come to this child from careful and sensitive efforts to reunite him with his father.

[*M.M., supra,* 382 *N.J.Super.* at 282–83, 888 *A.*2d 512.]

I would affirm the judgment of the Appellate Division reversing the trial court's order terminating the parental rights of the father substantially for the reasons expressed in the Appellate Division's thoughtful opinion.

Justice RIVERA–SOTO joins in this opinion.

*For reversal and reinstatement*—Justices LONG, LaVECCHIA, ZAZZALI and ALBIN—4.

*For affirmance*—Justices WALLACE and RIVERA–SOTO—2.