# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2673-17T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

T.C.,

      Defendant-Appellant,

and

J.D.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.D.,

      a Minor.

_____

      Submitted December 10, 2018 – Decided December 27, 2018

      Before Judges Messano and Fasciale.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FG-14-0028-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Phuong V. Dao, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Maria E. Borges, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant T.C. (the father) appeals from a February 1, 2018 order terminating his parental rights to S.D. (the child), born in 2010. Judge Maritza Berdote Byrne presided over the trial, entered the order under review, and rendered a forty-page written opinion. The father contends primarily that the Division of Child Protection and Permanency (the Division) failed to sustain its burden of proof. We disagree and affirm.

After the police arrested the mother for her involvement in a sting operation, the Division performed a Dodd[1] removal when the child was approximately five-years-old. At this point in the child's life, the father – who did not know he was the father "until after a while had passed" – had seen him about three times. The father suffers from an alcohol problem and lacks insight into the child's needs, and thus was unable to provide the child with a permanent, safe, and stable home. As a result, the Division placed the child with resource parents, who want to adopt him.

The governing law is settled. Parents have a constitutionally-protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To

---

[1] A "Dodd removal" refers to the emergency removal of a child from the home without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests.

To obtain parental termination, N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

Our review of a family judge's factual findings is limited. <u>Cesare v. Cesare</u>, 154 N.J. 394, 411 (1998). "When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." <u>N.J. Div. of Youth & Family Servs. v. R.L.</u>, 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings, which undergird such a judgment, "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" <u>In re Guardianship of J.T.</u>, 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co.</u>, 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." <u>R.L.</u>, 388 N.J. Super. at 89. There exists substantial credible evidence in the record to support the judge's findings as to all four prongs. We briefly summarize those findings.

For the first prong, the judge found that the father had a chronic untreated alcohol abuse problem, and that he lacked insight into the child's needs. He has

not provided a stable environment for the child, and when the father visited with the child, the visits caused the child to suffer from anxiety.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent . . . is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The relevant inquiry for the trial court is whether the parent has cured and overcome the initial harm that endangered the child, and "is able to continue a parental relationship without recurrent harm to the child." K.H.O., 161 N.J. at 348.

The judge found that the father's "significant substance abuse issue ha[d] not been remedied." She also found that "both prior to [the child's] removal and after [he] was placed in resource care, [the father] . . . acted minimally and without any sense of urgency with respect to [the child's] needs." Despite believing he was the child's father, he refused to engage in any services until the Division established paternity. Once paternity was confirmed, he "took more than a year to obtain suitable housing, failed to visit with [the child] for a period of six months and admitted he was lax in communicating with the Division." It took him sixteen months to submit a parenting plan, and eighteen months to take a parenting class. He did not contact the child's therapist or teachers despite

6

being encouraged to do so. And during this time, he continued using alcohol. The judge concluded that the father's lack of insight was unlikely to change in the foreseeable future and would add to the delay of permanently placing the child in his care.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). However, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

The judge found that the father first engaged in Division services in January 2016, only after he received the paternity test result. The Division provided him with psychological and substance abuse evaluations. The Division also met with the father and "developed written family agreements" addressing

necessary services, such as adequate housing, a suitable parenting plan, attendance at AA meetings, and engagement with the child's doctor and therapist to understand his needs. The Division offered the father "family team meetings, evaluations, parenting classes, and access to [the child's] doctors and teachers," but he "failed to avail himself of these services until the very last possible moment and, in some circumstances, not at all." The judge further found that the Division considered alternatives to termination of the father's parental rights, including placing the child with family and friends, all of whom indicated that they could not care for the child.

Under the fourth prong, the court must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with [his] foster parents." K.H.O., 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012).

The judge found the testimony of Dr. Maureen Santina, an expert in psychology and substance abuse, "the most compelling and accurate because the

two other experts accepted [the father]'s self-report of long term sobriety and did not consider [his] use of alcohol to be a factor in determining his capacity to parent." The judge concluded that the other experts "incorrectly focused" on the father's past driving while intoxicated offenses instead of his current use of alcohol or the effectiveness of his prior substance abuse treatment.

The judge agreed with Dr. Santina that the father "exhibited a substantial level of denial and persistent pattern of minimization regarding his substance abuse." The father contradicted himself regarding his consumption of alcohol, his belief whether he had an alcohol problem, and his lack of effective treatment. Although he "reported extensive involvement in AA," he still consumed alcohol and remained unfamiliar with details of the program.

The judge also agreed with Dr. Santina that the father did not understand the child's needs. As Dr. Santina testified, the child's history of trauma and consequent PTSD made him "hypersensitive" to a lack of predictability and required enhanced stability, security, consistency, and empathy. If his needs were not met, he was likely to experience elevated levels of anxiety, depression, anger, and social aggression. The father did not have the capacity to meet the child's needs, whereas the child derived safety and security from his resource parents. The judge accepted Dr. Santina's testimony that if the child was

separated from his resource parents he would suffer severe and enduring harm that the father could not ameliorate. By contrast, terminating the father's parental rights would have a minimal impact on the child, and his resource parents were capable of mitigating any harm.

The judge found that the findings of Dr. Eric Kirschner, an expert in clinical psychology, bonding, and parenting assessment, "were consistent" with Dr. Santina's. Dr. Kirschner testified that the child had a strong bond with his resource parents, but not with the father. Removing the child from his resource parents would be psychologically harmful in the short-term and long-term because it would create disruption and anxiety, which would exacerbate the child's PTSD. Dr. Kirschner likewise recommended that the child remain with his resource parents.

The court found that the conclusions of the father's expert, Dr. James Reynolds, "were not contrary" to the other two experts. He opined that the child would suffer "some harm" if the father's parental rights were terminated, and lesser harm if he was removed from his resource parents. Dr. Reynolds testified that the child did not view the father as his psychological parent, and agreed that the resource parents could mitigate the harm to the child from terminating the

10

father's parental rights. Thus, as the judge noted, Dr. Reynolds's and Dr. Santina's testimony differed, but was not necessarily in conflict.

The judge concluded that "all three experts opined [the child] has a secure attachment with his resource parents and the resource parents would be able to mitigate any harm resulting from the termination of [the father's] parental rights." Thus, she found that the Division proved by clear and convincing evidence that termination of the father's parental rights would not do more harm than good to the child.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2673-17T3