RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3983-15T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

 Plaintiff-Respondent,

v.

L.C.,

 Defendant-Appellant,

and

L.W.,

 Defendant.
____________________________________

IN THE MATTER OF THE GUARDIANSHIP
OF A.W., a Minor.
____________________________________

 Submitted March 9, 2017 – Decided April 19, 2017

 Before Judges Hoffman, O'Connor, and
 Whipple.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Union
 County, Docket No. FG-20-12-16.
 Joseph E. Krakora, Public Defender, attorney
 for appellant (Kylie A. Cohen, Assistant
 Deputy Public Defender, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Andrea M.
 Silkowitz, Assistant Attorney General, of
 counsel; Ellen L. Buckwalter, Deputy
 Attorney General, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor (David
 Valentin, Assistant Deputy Public Defender,
 on the brief).

PER CURIAM

 Defendant L.C. (mother) appeals from the May 4, 2016 Family

Part judgment terminating her parental rights to her daughter,

A.W. (Alice), presently three and one-half years of age.1 Before

the guardianship trial, defendant L.W. (father), Alice's

biological father, executed an identified surrender of his

parental rights to his parents and did not participate in this

appeal.

 The mother contends the New Jersey Division of Child

Protection and Permanency (the Division) failed to present clear

and convincing evidence to sustain the judgment terminating her

parental rights. We disagree and affirm.

1 We use the pseudonym "Alice" to protect the child's privacy.
 2
 A-3983-15T1
 I

 We summarize the salient evidence. In March 2014, the

mother delivered then six-month-old Alice to the police station,

reporting she was giving up the child because she was too

overwhelmed to care for her. Later in the day, the mother

regretted her decision and returned to the police station to get

the baby, but by then the Division was involved and executed an

emergent removal of Alice and placed her in a resource home. In

April 2014, Alice was placed in her paternal grandparents'

physical custody, with whom she has lived since. The paternal

grandparents want to adopt Alice. The baby's maternal

grandmother was also considered as a resource home, but she did

not have adequate space in her home. The maternal grandmother

subsequently moved to North Carolina.

 The court ordered the mother to submit to various

evaluations and engage in a number of services. In 2014, the

mother submitted to psychological and psychiatric evaluations,

which revealed she is afflicted with serious mental health

problems. The psychological evaluation showed the mother had

clinically significant maladaptive personality traits, and her

overall ability to parent was compromised. The psychiatric

evaluation revealed the mother had a history of hallucinations

and exhibited symptoms of paranoia.
 3
 A-3983-15T1
 The mother was ordered to participate in individual therapy

and comply with all treatment recommendations, which included

taking anti-psychotic medication. The mother attended only ten

of the forty therapy sessions scheduled. She briefly took

psychotropic medication, but ceased because it made her feel

tired. For the balance of the litigation, the mother maintained

there was nothing wrong with her and, thus, she did not need

medication or psychotherapy. She did complete parenting

classes, and she also visited Alice until March 2015, when she

moved into the maternal grandmother's home in North Carolina.

 In July 2015, the mother returned to New Jersey with her

six-week-old twins. The twins' father is Alice's father. In

September 2015, the Division removed the twins from the mother's

care because she was not taking her medication or participating

in therapy and was putting the twins at risk for harm. The

twins were placed in their paternal grandparents' home, where

they have lived since.

 The mother submitted to another psychological and

psychiatric evaluation in 2016, as well a bonding evaluation.

The paternal grandparents also participated in a bonding

evaluation. Carla Cooke, Ed.D., who conducted the psychological

evaluation, testified the mother did not have the capacity to

parent because of her mental health condition, which has
 4
 A-3983-15T1
produced psychotic symptoms and has resulted in a lack of

insight and compromised decision-making. Dr. Cooke opined the

mother's prognosis for change was poor.

 Dr. Cooke, who also conducted the bonding evaluations,

testified the evaluation of the mother and Alice revealed no

bond existed between them. Dr. Cooke found the mother did not

know how to interact with the child, and the child was not

responsive to her at all. On the other hand, Alice had a

"strong and secure" bond with the paternal grandparents, who

were "very attentive to" and "very absorbed in" Alice. Dr.

Cooke noted the paternal grandparents have created an

environment in which she is thriving. Dr. Cooke opined it would

do more harm than good if Alice were removed from her

grandparents' care, because of her strong and healthy

relationship with them, whom she sees as her psychological

parents.

 Samiris Sostre, M.D., who conducted both psychiatric

evaluations, testified the mother has a psychotic disorder. Her

disorder impairs her from interpreting emotional cues another

may signal or from recognizing another person's needs, impeding

her ability to care for a child. The mother even stated she

does not feel any connection to the child. The doctor noted:

 5
 A-3983-15T1
 [The mother] would be unable to recognize
 what her daughter's needs are; unable to
 read through the social [cues], body [cues],
 and verbal [cues] about her emotional needs
 and respond to them appropriately. [The
 mother] hasn't been able to respond
 appropriately to other people. It would be
 difficult to respond to a child. [The
 mother] would be more likely to have
 outbursts. And then her level of
 functioning has gone down over time.

 Dr. Sostre expressed concern about the mother's prognosis,

given the mother's resistance to treatment. The doctor stated:

 [W]ith the course of these major psychiatric
 disorders . . . compliance will always
 remain an issue. That if you don't think
 there's a psychiatric disorder, you're [sic]
 chances of actually addressing it are going
 to be very, very, very, low; that you have a
 psychiatric disorder that you can't manage
 independently, because the disorder itself
 doesn't permit you to recognize the symptoms
 or report them to the doctor that's treating
 you.

 The mother did not testify, call any witnesses, or

introduce any documentary evidence.

 After weighing the evidence, the trial court set forth its

findings in a lengthy oral opinion, concluding the Division

established all four prongs of N.J.S.A. 30:4C-15.1(a), and

ordered termination of the mother's parental rights to Alice.2

2 These four prongs are:

 6
 A-3983-15T1
 II

 On appeal, the mother contends the Division's proofs were

insufficient to satisfy all four prongs in N.J.S.A. 30:4C-

15.1(a). After perusing the evidence and considering the

applicable legal principles, we conclude the court's decision to

terminate the mother's parental rights is amply supported by the

evidence.

 When terminating parental rights, the court focuses on the

child's best interests. Ibid. The State must satisfy the best-

 (1) The child's safety, health, or
 development has been or will continue to be
 endangered by the parental relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm.
 Such harm may include evidence that
 separating the child from his resource
 family parents would cause serious and
 enduring emotional or psychological harm to
 the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent
 correct the circumstances which led to the
 child's placement outside the home and the
 court has considered alternatives to
 termination of parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 [N.J.S.A. 30:4C-15.1(a).]
 7
 A-3983-15T1
interests-of-the-child test by showing all four prongs in

N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, in

order to terminate parental rights. N.J. Div. of Youth & Family

Servs. v. F.M., 211 N.J. 420, 447-48 (2012). These four prongs

require a fact-sensitive examination of the particularized

evidence presented in each case. N.J. Div. of Youth & Family

Servs. v. M.M., 189 N.J. 261, 280 (2007).

 In reviewing a case in which termination of parental rights

has been ordered, we remain mindful of the gravity and

importance of our review. See N.J. Div. of Youth & Family

Servs. v. I.S., 202 N.J. 145, 151 (2010) ("The process for

terminating parental rights is a difficult and intentionally

rigorous one that must be satisfied by a heightened burden of

proof . . . ."). Parents have a constitutionally protected

right to enjoy a relationship with and to raise their children

without State interference. N.J. Div. of Youth & Family Servs.

v. E.P., 196 N.J. 88, 102 (2008). This right is protected by

the United States and New Jersey Constitutions. Ibid.

 However, this right is not absolute, as it is limited by

the "State's parens patriae responsibility to protect children

whose vulnerable lives or psychological well-being may have been

harmed or may be seriously endangered by a neglectful or abusive

parent." F.M., supra, 211 N.J. at 447. The State has a strong
 8
 A-3983-15T1
public policy that favors placing children in a permanent, safe,

and stable home. See In re Guardianship of K.H.O., 161 N.J.

337, 357 (1999).

 Moreover, "the trial court's factual findings should be

upheld when supported by adequate, substantial, and credible

evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J.

527, 552 (2014). We defer to the trial court's credibility

findings and, in particular, its fact findings because of its

expertise in family matters, see N.J. Div. of Youth & Family

Servs. v. M.C. III, 201 N.J. 328, 343 (2010), unless the trial

court's findings are "so wide of the mark that the judge was

clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L.,

191 N.J. 596, 605 (2007).

 As stated, we reject defendant's challenge the Division

failed to meet each prong of N.J.S.A. 30:4C-15.1(a) by clear and

convincing evidence, and address the mother's principal

contentions.

 The mother's attack on the proofs undergirding the

satisfaction of the statute's first two prongs suggests the

judgment must be reversed because the mother neither harmed nor

posed a risk of harm to the child. See N.J.S.A. 30:4C-

15.1(a)(1), (2). The claim lacks merit.

 9
 A-3983-15T1
 Providing proof a parent has in fact harmed a child is not

essential to showing the first prong has been satisfied. See

N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 605

(1986). When no proven actual harm is shown, the first prong

will be satisfied by evidence showing a parent will endanger the

child's health, safety or welfare. See In re Guardianship of

D.M.H., 161 N.J. 365, 383 (1999). A court does not have to wait

until a child is "irreparably impaired by parental inattention

or neglect" before it acts. Ibid. (quoting A.W., supra, 103

N.J. at 616 n.14).

 Here, there was unrefuted evidence the mother suffers from

a major psychiatric disorder that disables her from recognizing

or ascertaining the needs of a child. There is no question such

disorder will endanger the child's safety, health, or

development. The second prong was satisfied because the mother

is unwilling to eliminate the harm facing the child. She has

spurned taking anti-psychotic medication and engaging in

therapy. Proof of the mother's limitations and her resistance

to treatment provide the requisite evidence to establish the

first and second statutory prongs were met.

 The Division offered a number of services to the mother.

She completed a parenting course and visited the child when in

New Jersey, but she did not consistently participate and
 10
 A-3983-15T1
ultimately refused to engage in therapy. She also refused to

take psychotropic medication. The mother argues the Division

did not help her find housing or employment. Even if this were

true, and we do not suggest it is, the fact the mother did not

secure stable housing or employment is not what underpins the

decision to terminate her parental rights. The fact the mother

suffers from a major psychiatric disorder that impairs her

ability to care for Alice and her refusal to engage in any

treatment is what drives the decision to terminate her parental

rights.

 The mother also argues that, at the time the trial

concluded, an assessment of the maternal grandmother's home as

an alternative relative placement was still pending. Thus, she

contends the third prong was not satisfied. Here, the Division

did explore both the maternal and paternal grandparents' homes

after the child's removal in its endeavor to place Alice with a

relative. The maternal grandmother's home was ruled out, but

the paternal grandparents' home was found to be acceptable.

After the maternal grandmother moved to North Carolina, the

Division did seek an evaluation of her home, but as the

Division's caseworker testified, this assessment was ordered as

a "back-up" to the paternal grandparents' home.

 11
 A-3983-15T1
 By the time of trial in 2016, Alice had been living with

her paternal grandparents for over three and one-half years, and

during that time she developed a strong and secure bond to them.

There was testimony her removal from their home would cause her

harm. Further, Alice's siblings now live with the paternal

grandparents. The "value of nurturing and sustaining sibling

relationships" cannot be underestimated. N.J. Div. of Youth and

Family Servs. v. S.S., 187 N.J. 556, 561 (2006).

 The Division appropriately considered and placed Alice with

relatives, see N.J. Div. of Youth & Family Servs. v. K.L.W., 419

N.J. Super. 568, 579 (App. Div. 2011) (citing N.J.S.A. 30:4C-

15.3(a)), who now wish to adopt her and provide her permanency.

See N.J.S.A. 30:4C-11.3 (stating that "the child's need for

permanency shall be of paramount concern to the court"). The

fact the assessment of the maternal grandmother's home had not

been completed by the time of trial is irrelevant. Even if the

maternal grandmother's home had been approved, there was no

evidence to support Alice would have or should have been removed

from the paternal grandparents' and transferred to the maternal

grandmother's home.

 There is unrefuted evidence the fourth prong was met;

termination of the mother's parental rights will not do more

harm than good. Finally, to the extent we have not addressed
 12
 A-3983-15T1
any of the mother's remaining arguments, it is because we found

they lacked sufficient merit to warrant discussion in a written

opinion. See R. 2:11-3(e)(1)(E).

 In summary, because there was substantial credible evidence

the best interests of the child justified termination of the

mother's parental rights, we find no basis to interfere with the

trial court's conclusion to enter the judgment of guardianship.

 Affirmed.

 13
 A-3983-15T1