# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1352-16T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

J.N.,

    Defendant-Appellant,

and

C.M.,

    Defendant.

─────────────────────────────────

IN THE MATTER OF THE
GUARDIANSHIP OF V.N.,

    a Minor.

─────────────────────────────────

        Submitted March 13, 2018 — Decided June 7, 2018

        Before Judges Fasciale, Sumners and Moynihan.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Burlington
        County Docket No. FG-03-0057-15.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Patricia Nichols, Assistant

Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Angela Juneau Bezer, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant J.N. (Jake)[1] appeals the Family Part's order terminating his parental rights to his then five-year-old son, V.N. (Vic).[2] Jake contends that he was denied effective assistance of counsel; that the court failed to adjudicate various motions he filed; that the court erred in denying his motion to dismiss the Division of Child Protection and Permanency's (the Division) guardianship complaint; and that the court failed to set forth factual findings and conclusions of law to establish that the Division proved all four prongs of the best-interests-of-the-child standard, N.J.S.A. 30:4C-15.1(a). The Division and the Law Guardian argue that the order should be affirmed. After reviewing the record in light of the applicable legal standards, we affirm.

---

[1] Pseudonyms are used for privacy and for ease of reference.

[2] The order also terminated the parental rights of Vic's mother, C.M. (Callie), who has not appealed.

The pertinent evidence and relevant procedural history was set forth in Judge Patricia Richmond's comprehensive sixty-seven page oral decision. A summary will suffice here. In 2012, when Vic was just eleven months old, Jake, a self-described Romanian gypsy, was arrested in Michigan for drug possession, retail fraud, and assault with a dangerous weapon. He was later convicted — with a maximum sentence to expire in May 2027 — and has remained incarcerated throughout this proceeding. After Jake's arrest, Vic's custody defaulted full-time to his mother, Callie. That however lasted a little less than two years.

On March 23, 2014, Callie, living in Massachusetts at the time, had left Vic in the care of Jake's parents, who lived in New Jersey, when police pulled over their erratically driven car at 2:00 a.m. in Mount Laurel. Beer bottles, crack cocaine, drug paraphernalia, and a fake handgun were found in the car. The parents were heavily intoxicated and had multiple outstanding warrants for their arrest. Vic, almost three years old at the time, was not in a car seat but was sitting on the lap of an unrelated adult, who also had outstanding warrants. That day, the

Division instituted a Dodd[3] removal and placed Vic with a non-relative resource family.

Abuse and Neglect (FN) proceedings were filed against Callie, Jake's parents, and Jake, who was not charged with any offense but despite being listed only as a dispositional defendant was afforded counsel. The Division thereafter filed a guardianship (FG) complaint to obtain guardianship of Vic, and when the parties consented to dismiss the FN litigation on May 8, 2015, Jake's counsel was relieved. When the FG litigation commenced, Jake was unable to participate by telephone because the Detroit detention center in which he was housed had not received prior notice. At a subsequent hearing, Jake appeared by telephone and was assigned the same counsel who represented him in the FN litigation.

Thereafter, Jake filed pro se motions to dismiss the complaint and to replace his counsel. However, Jake reconsidered and continued with counsel's representation. He represented that he expected to be released from jail after completing a boot-camp-type program. But he later misrepresented that he was unable to complete the program due to an asthma problem, when in reality he was removed from the program, after less than a month, for

---

[3] A "Dodd removal" refers to the emergency removal of a child from a home without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

"refusing to follow the rules and regulations of the program[,] . . . mocking a staff person[,] . . . insolent behavior[,] . . . [and] continually attempt[ing] to manipulate the program." Attempts to schedule trial were delayed when several adjournments were granted based upon Jake's representations that he would be paroled on certain dates — which he was not.

At a January 15, 2016 hearing, Jake appeared by phone, with his counsel appearing in court, and complained that he was unable to speak to counsel due to either the Division's failures or counsel's office's refusal to accept collect calls. These problems were resolved through the collective efforts of the parties and the court. When Jake stated that he would be paroled on July 13, 2016, the court set the trial for August 3 and 4. However, a subsequent March 14 notice from the Michigan parole board provided that he was denied parole on March 8 because of the nature and extent of his criminal history, and he would not be considered for parole until July 13, 2017.

At an April 15, 2016 hearing, contrary to Jake's earlier representations, it was reported that according to Michigan corrections, Jake had never been eligible for parole until 2017, and that he had always been free to speak to Vic. A later corrections report provided that Jake was in segregation due to

fighting, again contradicting Jake's representations why he was unavailable for a scheduled hearing.

At a September 8, 2016 pretrial hearing, Jake appeared telephonically, and was represented by new assigned counsel.[4] During the three-day guardianship trial held later that month, Jake appeared by telephone, and was afforded — and took advantage of — the opportunity to confer privately by telephone with counsel during trial recesses when necessary. The Division's expert testified that Jake's grandmother would not be suitable as an independent caretaker for Vic due to her borderline intellectual functionality and her lack of a psychological bond with Vic. He further opined that Vic had a warm, positive, and secure psychological bond with his resource parents, and that he would be at a high risk of suffering severe and enduring harm if separated from them. Moreover, the expert stated that Vic did not recognize Jake when they spoke on the phone, and that Jake's evaluation revealed that he was dishonest regarding his co-habitation with Vic; his marriage history with Callie; Vic's custody history; and his prison disciplinary record. The expert concluded that Jake has an antisocial personality disorder — which

---

[4] Despite the court's prior denial of Jake's motion for new counsel, the Public Defender's Office appointed new counsel for Jake.

he was incapable of changing — and because "his irresponsibility, . . . would end up causing harm or at least significant risk of harm to [Vic]" if left to his care, Vic would be at a low risk of harm if Vic's relationship with Jake was severed.

The Division's caseworker testified that Callie — who the Division last had contact with in November 2014 — told the Division that she did not want anything to do with the guardianship proceedings, that Jake's family "is very violent" and "dangerous," and that she wanted Vic to live with his foster parents. The caseworker stated that since Vic has been under the care of his resource parents, who want to adopt him, he has caught up with his age-appropriate milestones. She further related that according to Jake's correctional facility, he was able to call Vic at the number provided by the Division but chose not to, or had lost his phone privileges when he was placed in segregation for disciplinary infractions.

Only Jake and his brother testified on Jake's behalf because according to counsel, none of Jake's other relatives that he proposed could testify returned counsel's telephone calls. Jake disputed this representation, and also claimed that counsel kept his family members from seeking custody of Vic. Judge Richmond took issue with this; stating that anyone who wanted to apply for custody need only file a complaint for custody, as Jake's

grandmother did. Jake's request for an adjournment claiming there was a break-down in communication with his counsel, that he wanted to retain an expert, and that his fiancé needed time to apply for custody, was rejected by the judge.

On the last day of trial, the judge denied Jake's motion for dismissal on the basis that the Division had not made a prima facie case to terminate his parental rights. The judge did allow Jake's brother — who had contacted counsel the night before — to testify telephonically, wherein he claimed that Jake was a good father. The Division had previously denied the brother's request to take custody of Vic because he misrepresented how many children he cared for and had unstable housing. The judge, however, rejected Jake's request that she delay issuing her decision because Jake's fiancé — who also contacted counsel the night before — advised that she had filed a custody complaint for Vic. The motion was denied; the judge's search of the court's records revealed that no complaint had been filed.

In her reserved oral decision, Judge Richmond terminated both Jake's and Callie's parental rights to Vic based upon the finding that the Division satisfied the four prongs of the best-interests-of-the-child standard, N.J.S.A. 30:4C-15.1(a). The judge credited the Division's witnesses' testimony and found that Jake's testimony was not believable and his plan to care for Vic was

unrealistic. Based upon Jake's extensive criminal history, she found that he was never available to parent Vic, thereby harming him through abandonment. Considering that Jake's maximum sentence runs to 2027, and that he has been denied parole three times, the judge reasoned it is unlikely — due to his misconduct in prison — that he will be released at his next parole board hearing in July 2017. And even if paroled, his parole would have to be transferred to New Jersey, and there would be a slow transition to grant him custody of Vic since he would have to find steady employment, along with a stable place to stay. Consequently, the judge determined the permanency of a nurturing and caring environment that Vic needed was available through his resource parents and not Jake, with whom Vic has never had a relationship. Because we defer to the judge's factual findings and credibility determinations, N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007), and conclude that Jake's arguments are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), we affirm substantially for the reasons set forth by Judge Richmond in her thorough and well-reasoned decision.

Turning to Jake's challenge regarding motions, he argues the judge failed to adjudicate his motions: to dismiss the guardianship complaint on lack of personal jurisdiction; to enforce the court

9                                                              A-1352-16T4

order regarding his telephone contact with Vic; to adjourn the guardianship trial until he is released on parole; and to dismiss at the end of the trial. All of his contentions lack sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E). We only add that N.J.S.A. 2A:34-68(a) establishes temporary emergency jurisdiction in New Jersey for Vic, who came under the Division's custody after his caretaker grandparents were arrested in Mount Laurel. The record demonstrates multiple instances where the court made significant efforts to accommodate Jake's Michigan incarceration. Any lack of communication with Vic ultimately boiled down to Jake's lack of effort to contact Vic. We also see no abuse of discretion in denying Jake's adjournment requests in light of the need to find permanency for Vic and the clear uncertainty of Jake's release date. Furthermore, Jake was afforded every opportunity to fully participate in the proceedings despite his incarceration by appearing telephonically and was allowed to take recesses to privately consult with counsel telephonically during the trial.

Finally, we reject Jake's contention that his counsel[5] were "ineffective due to a failure to communicate with [him] or to properly prepare for . . . the pretrial proceedings or . . .

---

[5] Two different counsel represented Jake at the pretrial hearings and at trial.

trial." He also argues that counsel were ineffective because they failed to object to the admissibility of evidence; filed unsuccessful motions to dismiss the defective guardianship complaint or for a new trial; failed to investigate factual, legal or expert defenses related to his gypsy culture; and failed to proffer family members as kinship legal guardians.

To sustain a claim of ineffective assistance of counsel, Jake must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984), that

> (1) counsel's performance must be objectively deficient--i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense--i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 307 (2007) (citing Strickland, 466 U.S. at 694).]

"[A]ppellate counsel must provide a detailed exposition of how the trial lawyer fell short and a statement regarding why the result would have been different had the lawyer's performance not been deficient. That will include the requirement of an evidentiary proffer in appropriate cases." Id. at 311. We may resolve the question of ineffective assistance of counsel on the appeal record alone, unless a genuine issue of fact is present, in which case a

remand for an expedited hearing before the trial court is necessary to determine the factual question.  Ibid.

Our review of the record does not indicate a need for an evidentiary hearing nor support Jake's contentions.  As for the FN proceeding, Jake contends effective assistance of counsel was denied throughout the "ten month" FN proceeding since he was mostly unrepresented by counsel and was not served notice.  He further contends the FN matter "achieved no benefit for [him], such as parenting time . . . despite an absence of abuse, neglect or unfitness, or . . . evidence of a diagnosed need."  However, Jake's contentions are misguided, as even he acknowledges that he "was not a target defendant," and the proceeding played no part in Judge Richmond's assessment of the harm she found that Jake inflicted upon Vic.  R. 2:11-3(e)(1)(E).

As for the FG proceeding, we note that Jake was assigned a new counsel when he felt his initial counsel was not adequately representing his interest.  We are convinced that his new counsel presented as strong a case as possible to challenge the Division's efforts, and argued vigorously at trial.  Jake's claims of ineffective assistance essentially question counsel's trial strategy not to present evidence related to his gypsy culture, however he fails to establish how this alleged deficiency changed the outcome of the case.

12

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1352-16T4