# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1085-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

C.B.,[1]

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.B.
and G.B., minors.

_____

Submitted September 22, 2021 – Decided October 25, 2021

Before Judges Fuentes, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cape May County, Docket No. FG-05-0021-19.

---

[1] We refer to the parties and the children involved in this case using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

Joseph E. Krakora, Public Defender, attorney for appellant (Patricia Nichols, Assistant Deputy Public Defender, of counsel and on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant C.B. is the biological father of twin six-year-old girls, G.B. (Gina) and I.B. (Ivy).  Defendant appeals from the final judgment of the Family Part terminating his parental rights to his two daughters.  After reviewing the record developed at the guardianship trial and mindful of our standard of review, we affirm.

I

On April 11, 2018, the Division of Child Protection and Permanency (the Division) received a referral from the Cape May County Prosecutor's Office that Gina's and Ivy's mother D.R. (Dina) had been seriously wounded from a gunshot to her head and was hospitalized at Atlantic County Medical Center.  Dina's friend found her prostrated on her bed unresponsive, but breathing, and

immediately called 911. Dina died later that day. That same day, the Division learned defendant was hospitalized at Hahnemann University Hospital in Philadelphia for a gunshot wound.

Defendant took the girls to their paternal grandmother A.B. (Andrea), who resided in Philadelphia. Andrea denied law enforcement officers access to the girls. On the evening of April 11, 2018, after confirming the children's permanent residence was in New Jersey, the Division executed a Dodd[2] removal and placed the children with their maternal grandmother D.B. (Daphne) and step-grandfather F.B. (Frank). On April 12, 2018, the Division filed a verified complaint and an Order to Show Cause (OTSC) seeking custody of the children. The Family Part granted the OTSC the following day and awarded custody of the children to the Division.

The ensuing investigation revealed that on the day the police responded to the 911 call reporting Dina's mortal head wound, the Philadelphia Police Department confirmed defendant was hospitalized for a self-inflicted gunshot wound to his head. This family tragedy can be traced to defendant's ostensible

---

[2] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

suicide attempt, which resulted in Dina being shot in the head. Defendant alleged he had been growing increasingly depressed after he had been passed over for a job. According to defendant, he was "in a dark place . . . a very low place in [his] life at that time."

Defendant's Account of His Wife's Death

On April 10, 2018, defendant slept with a loaded handgun under his pillow because he was contemplating suicide. When he awoke the next morning, he heard the voices of his two-year-old daughters in the next room. One of the girls came into his room to say hello to him and "went into the bathroom with her mother." Defendant rose from the bed and went to the kitchen to prepare the girls' breakfast, which consisted of two unopened containers of yogurt because they "insisted on opening by themselves." He gave the girls their "tablets to play with, because that's what they like to do" and watched them as they returned to their room, "got on their bed and closed the door."

Defendant returned to his bedroom with Dina to explain he was feeling suicidal. When he did not get "any responses" from her, defendant testified:

> I put the gun to my head. She looked at me and she like tried to -- what she did she pushed it away. And she called me crazy and . . . then I told her not to try to stop me, just let me do it because <u>nobody loves me</u>.
>
> I closed my eyes and I put the gun back to my head.

4

. . . .

> But everything just happened so fast when she tried to like -- when she came . . . at me and tried to grab the gun away from me and it went off. Now, it was really muffled. It wasn't loud. Anybody who's ever shot a firearm before knows that when a firearm's discharged close to your ear, you're [sic] ear's going to hurt like crazy. That didn't happen. Maybe it was because of how I was feeling, I don't know.

> [(Emphasis added).]

According to defendant, immediately after he fired the handgun, Dina "just [got] back on the bed regular . . . ." Based on Dina's seemingly banal reaction, defendant thought "she was fine because she didn't seem like anything was wrong with her." He did not attend to her injuries because he "didn't see any blood at first." He looked around the room attempting to determine "where that round was discharged" when he noticed Dina "had some speckles of blood on her face, like on her right cheek." Defendant did not call 911 to report the incident nor make any effort to summon medical assistance for his wife.

A Cape May County grand jury indicted defendant for first degree murder, N.J.S.A. 2C:11-3(a)(1), second degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), second degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and third degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1). Defendant entered into a negotiated agreement with the

State and agreed to plead guilty to first degree aggravated manslaughter, N.J.S.A. 2C: 11-4(a)(1), as a lesser included offense of first degree murder, and third degree hindering apprehension. In exchange, the State agreed to recommend that the court sentence defendant to an aggregate term of fifteen years of imprisonment, subject to an eighty-five percent period of parole ineligibility and five years of parole supervision, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2. On August 14, 2019, the Criminal Part sentenced defendant in accordance with the terms of the plea agreement.

<u>Division Services to the Children</u>

After the Family Part placed the girls in the custody of their maternal grandmother and step-grandfather, the Division immediately arranged to provide them with trauma counseling through the Thrive Program. The children were evaluated by clinician Jennifer Tapley, under the supervision of the program's Executive Director L. Michelle Codington, who is a Certified Family Trauma Professional.

The therapy sessions at the Thrive Program began towards the end of April 2018 and continued on a weekly basis for five to six hours. The counseling reports reflected the children experienced severe trauma and repeated disturbing language, some of which they may have heard in the home, including "[g]onna

A-1085-20

kill you" and "[n]eed to go get a doctor for . . . mommy in heaven because she has a boo[-]boo on her head." The reports also stated the children were anxious when separated from their caregiver or each other. The children's behavior eventually began to show signs of progress. In a report to the Division dated October 30, 2019, Executive Director Codington listed the following indications of improvements:

> Initially they could only sleep if they were in the same bed together. At school their cots had to be next to each other; and they would wind up on one cot. Now they now have separate beds at home and nap each day in school in separate rooms.
>
> Initially, they were unable to verbalize their needs but instead they screamed at an ear-piercing level. They are now able to verbalize ALL of their needs which indicates their confidence that their safe grown-ups will meet their needs.
>
> Prior to their mother's death, they were fully toilet trained (by age 2). After her death, they had frequent accidents and had to go back into pull ups. They are now back to toileting independently without accidents.
>
> They ate very little following their mother's death. When they did eat, they were unable to sit (at the table or anywhere else) to eat but rather grabbed a bit of something and wandered in a hypervigilant manner. They are now able to sit calmly at the kitchen table and take each meal with other family members.
>
> They were extremely dysregulated when treatment began. Their hypervigilance extended to the point of

literally looking for danger around each corner, with highly exaggerated startle response, climbing up the side of any safe adult and responding with sobbing or high-pitched screaming. They now function independently.

Likewise, their caregivers exhibit even stronger capacities to regulate their own emotions (i.e. grief, sadness, overwhelm) as they model for the twins how to manage big feelings.

The Family Part did not order the Division to allow the children to visit their biological father in prison. The Division nevertheless explored the possibility of having the children visit defendant. However, defendant's status as an inmate serving a lengthy sentence in a maximum-security correctional facility immediately revealed the futility of that endeavor. Furthermore, Thrive Executive Director Codington opined having any contact with defendant "could re-traumatize" the children. In short, the Family Part concluded visitation with defendant was not in the children's best interests.

<u>Defendant's Psychological Evaluation</u>

From July 2018 until the end of that year, a Division caseworker visited defendant twice a month. During these interactions, defendant steadfastly denied that his infant daughters were emotionally traumatized by their mother's violent death. Oblivious to the fact he was confined in a penal facility, defendant continued to assert he should be allowed to have direct contact with his

daughters because no one knew his children better than him. Beginning in January 2019, defendant declined to meet with the Division caseworker assigned to his case. Following the Division's protocol, the caseworker continued to reach out to defendant without success. These visits finally stopped on March 13, 2019.

On March 20, 2019, the Family Part conducted a permanency hearing where the court dismissed the Title Nine complaint and adopted the Division's permanency plan to terminate defendant's parental rights, followed by adoption by the maternal grandmother and step-grandfather. The court found this approach was in the best of interest of the children. On April 18, 2019, the Division filed this guardianship complaint.

The Division retained psychologist Dr. James Loving to perform a bonding evaluation of defendant and the children to determine whether severance of his parental relationship was in the best interest of his daughters. Dr. Loving opined a bonding evaluation with defendant was not in the children's best interest because such an encounter was likely to retraumatize them. The court determined visitation was not in the children's best interest. The court allowed Dr. Loving to perform a caregiver bonding evaluation between the children and their maternal grandparents.

A-1085-20

## Guardianship Trial

The Family Part conducted the guardianship trial on October 13, 2020, and October 20, 2020. On November 18, 2019, the court conducted a plenary hearing and granted the Division's motion, over the objection of defendant's counsel, to admit Thrive Director Codington as an expert witness in the field of "trauma focused therapy for children."[3] Codington also explained it would be detrimental to the girls' emotional development to be in direct contact with defendant:

> Q. Do you think the girls are able to make a choice right now as to whether or not they want to see their [father?]
>
> A. Absolutely not. Developmentally they're very fragile. Their healing has begun, but it is far from over. Any change in their environment at all has proven to be very troublesome for them. Predictability is essential. Their functioning is reflective of that.

---

[3] The judge has the discretion to admit a witness as an expert under N.J.R.E. 702 and N.J.R.E. 703, provided the proposed witness satisfies three core requirements: (1) the intended testimony must concern a subject matter that is beyond the ken of the average fact-finder; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony. Townsend v. Pierre, 221 N.J. 36, 534 (2015). We discern no legal or factual basis to conclude the judge abused her discretion in admitting Codington as an expert in the field of focused trauma therapy for children.

Q. Okay. And, what do you think would happen based on your talking to your therapist that is treating the girls and what you know? What do you think would happen if we would make these girls go through a bonding [evaluation?]

A. If choice was taken away, if they were subjected to an unfamiliar environment and unfamiliar people, and this would be the first contact they would have with their father since the murder of their mother, it would be tremendously traumatizing.

The judge also considered Codington's testimony in reaching her final decision to terminate defendant's parental rights. In her October 30, 2019 report to the Division, Codington provided a comprehensive review of the children's therapeutic progress. She also discussed the vestiges of the emotional harm the girls endured on the day defendant shot and killed their mother.[4] Codington's report includes how a seemingly ordinary moment in the girls' lives can reveal how they continue to struggle with the memories of this horrific event.

[Ivy] and [Gina] have used words to describe some bits and pieces that they do recall from the tragic events of April 11, 2018. While taking a bath one day, [Ivy] made a "finger gun" with her hand and said: "My daddy had a gun, Mimi. (child made a "pow-pow" noise)[.] He shot my mommy and there was bleed [sic] all over." Language such as this suggests that the child was recounting (to the best of her ability) what she experienced in age-appropriate language. Other

---

[4] Defendant's admission of criminal culpability in causing Dina's death is legally definitive and was properly considered in this context.

indications that the girls actually witnessed the gruesome details of the murder include their initial avoidance of anything red (even [P]lay[-]doh) as it seemed to remind them of mother's blood, their extremely strong reactions to anything that resembled a gun and their specific reference to the location of mother's wound ("boo[-]boo on her head").

The judge also considered the testimony of Division caseworker Jessica Davis, who was assigned to the case in April 2019. Davis testified she attempted to arrange for defendant, who was incarcerated at all times, to have contact with the girls. The nature of the penal institution where defendant was detained made it impossible to create an appropriate environment for the children. Davis also informed the judge the girls had made significant progress since residing with their maternal grandmother.

> The girls are both potty trained fully again. They are doing much better sleeping through the night now. Their night terrors have pretty much disappeared. It's very infrequent that they happen at all now. The girls do well with being separated. Last year in pre-K they started in separate classrooms. At first it was a little difficult for them at first, but the separation ended up being good for them. They started gaining some independence, forming you know friendships on their own outside of each other. They are sleeping through the night, most nights now. [Their] eating has improved. Like [any] five[-]year[-]old they're picky at times, but . . . you know they eat well like they should.

> You know they're still afraid of the dark at times but not like they used to be. So, overall they have really made some leaps and bounds.

Davis investigated allegations made by defendant's father that the girls were mistreated and abused by the maternal grandparents. None of the allegations involving physical abuse were substantiated. However, the Division became aware of an alleged incident of inappropriate contact by a cousin who resided with the maternal grandparents. The Division confirmed the grandparents were not aware of this alleged behavior. The grandparents agreed to be more vigilant and to ensure the girls had constant supervision. No further incidences occurred, and the cousin was moved into another room before ultimately moving out of the grandparents' home. The Division did not find competent evidence to support a change in the girls' custodial arrangement.

Dr. Loving was the Division's second and last witness at the guardianship trial. He conducted a psychological evaluation of defendant to determine whether "he would be capable of regaining custody of his daughters in the foreseeable future, whether that would be a safe and healthy plan for the girls." However, Dr. Loving did not complete a bonding evaluation of defendant because, in light of the salient facts of this case, he firmly believed it was not in the best interests of the children. According to Dr. Loving, defendant did not

13

appreciate the harm the girls had endured in being present when their mother was shot and killed. He explained:

> It's unclear to me exactly what happened, but I would expect most reasonable people might be doubtful, might express skepticism about his girls being traumatized as young as they were . . . and the way that the incident played out. But what I'm describing for him that I think is important is qualitatively different than that. What I'm describing is a rigid denial of even the possibility that the girls were affected by what happened that day. And by affected, I mean traumatized in the sense of having seen or been affected emotionally by what happened.

Dr. Loving was astonished by defendant's inability to appreciate how this violent event may have permanently jeopardized the mental health and emotional wellbeing of his infant daughters. Because Dr. Loving did not perform a bonding evaluation of defendant, he was unable to determine the degree of harm that would result from terminating defendant's parental rights. However, he concluded the maternal grandparents were willing and capable of mitigating any harm that might result. He also opined that removing the girls from their grandparents' care would place them at a serious risk of harm. Defendant's lengthy prison sentence, coupled with his lack of empathy and emotional insight, rendered him unable to ameliorate that harm.

14

Defendant testified on his own behalf. He recounted the events of April 11, 2018, and denied responsibility for any harm suffered by his daughters. On cross-examination, he admitted he left Dina's seemingly lifeless body on the bed, left the house with his two-year-old daughters, and did not take any measures to alert the authorities about his wife's medical condition until after he reached Philadelphia, about one hour and forty-five minutes later. Defendant also admitted his actions "potentially" placed his children in grave danger by discharging a firearm in a room that was next to their bedroom.

Against this factual backdrop, Judge Susan M. Sheppard, the Presiding Judge of the Family Part in Cape May County, issued a comprehensive oral opinion on November 25, 2020, followed by a twenty-five-page Summary Decision that addressed each of the four statutory-prongs codified in N.J.S.A. 30:4C-15.1(a). The judge found the Division proved, by clear and convincing evidence, the termination of defendant's parental rights to his biological daughters Ivy and Gina was in the best interest of these children. We agree with Judge Sheppard and affirm.

II

This court reviews a judgment of termination of parental rights mindful that we are bound to uphold the Family Part judge's factual findings as long as

A-1085-20

they are supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Our Supreme Court adopted this deferential standard of review because Family Part judges are presumed to have a "specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012). Furthermore, we are bound to defer to the trial court's credibility determinations because the trial judge's proximity to the litigants provides "a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

Here, defendant raises the following arguments: (1) the Family Part erroneously relied on and extrapolated facts from defendant's judgment of conviction in the Criminal Part; (2) the court erred in relying on the testimony of the children's therapist and her supervisor and by denying defendant the right to visit the children; (3) the trial court's opinion does not satisfy the requirements under Rule 1:7-4; (4) the court erred by concluding, as a matter of law, that the Division satisfied the requirements under prongs I and II in N.J.S.A. 30:4C-15.1(a); (5) the court erred in concluding, as a matter of law, that the Division

made reasonable efforts to avoid termination of defendant's parental rights; and (6) the court erred in concluding that termination of parental rights would not do more harm than good.

Before we address defendant's arguments, we note that argument points (1), (2), and (3) were not raised before the trial court. Thus, we review these arguments under the plain error standard codified in Rule 2:10-2. This standard requires us to disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." However, this court "may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court." Ibid. In this light, defendant's argument points (1) and (2) not only fail to meet this enhanced standard of review, but also lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Although not subject to the plain error standard, defendant's remaining arguments are equally meritless. Even a cursory review of her Summary Decision shows Judge Sheppard did not decide the outcome of this guardianship trial merely as a matter of law. The judge carefully reviewed the testimony of the Division's witnesses, as well as defendant's own testimony. The judge then

applied the four statutory prongs and found the Division met its burden of proof by clear and convincing evidence.

N.J.S.A. 30:4C-15.1(a) states:

> The [D]ivision shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to . . . [N.J.S.A.] 30:4C-15) if the following standards are met:
>
> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

This court is well aware of the magnitude of the power entrusted to the judiciary in the area of parental rights and the equally awesome responsibility to safeguard and protect the welfare of children. As this court noted nearly twenty years ago:

18

> Parents have a fundamental constitutional right to raise their children. Stanley v. Illinois, 405 U.S. 645, 651 (1972); N.J. Div. of Youth and Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986). However, the constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children. Parham v. J.R., 442 U.S. 584, 603 (1979); In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).
>
> [N.J. Div. of Youth & Fam. Serv. v. J.Y., 352 N.J. Super. 245, 261 (App. Div. 2002).]

More recently, we reaffirmed our commitment to scrupulously protect the parent-child bond and noted: "After the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights." In re Adoption of Child by J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015). We are convinced Judge Sheppard correctly applied the statutory standards to the relevant, and essentially uncontested, facts to conclude the Division proved, by clear and convincing evidence, that termination of defendant's parental rights is in the best interests of these two girls.

The material facts that form the legal basis of this case are undisputed. On April 11, 2018, defendant, without regard to the safety of his two-year-old daughters, recklessly shot and killed his wife by discharging a handgun in a room located adjacent to the girls' bedroom. Defendant's actions, under these circumstances alone, manifested an extreme indifference to the welfare of his

19

children.    Furthermore, motivated exclusively by his own self-interest, defendant absconded from this horrific scene, taking his two infant daughters with him, and leaving the mother of his children to die alone.

After his mad dash from the crime scene, defendant did not take any measures to notify emergency medical services of his wife's fatal condition during the nearly two-hour drive to his mother's residence in Philadelphia.  The professionals who specialize in counseling children who have experienced this level of emotional trauma and psychic harm testified it is in the children's best interest not to have any contact with defendant.

After carefully considering the record and evidence presented at the guardianship hearing by the Division and defendant, Judge Sheppard made the following findings:

> This court finds the testimony provided by Dr. Loving to be very compelling regarding the children's best interest.  It is in their best interest to remain with their Grandparents, Mimi and Papa who have expressed their desire and willingness to adopt them.    These Grandparents, despite the tragedy of losing a daughter, have creditably illustrated to this court that they can and will provide for the health, safety, and stability of [Ivy] and [Gina] and are able to mitigate any potential harm that could arise with termination of [defendant's] parental rights and the death of their mother.
>
> This court finds that the [maternal grandparents] provide a permanent and stable home for the children.

20

> Further, this court finds that reunification with [defendant] is not possible and would be detrimental and cause lasting harm to [Ivy] and [Gina]. Therefore, the Division has met its burden under this prong by clear and convincing evidence.

We have nothing more to add to Judge Sheppard's analysis and conclusions. We thus affirm substantially for the reasons expressed by Judge Sheppard in her oral decision delivered from the bench on November 25, 2020, and subsequently memorialized in her Summary of Decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1085-20