# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2873-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

V.S.,

      Defendant-Appellant.

_____

IN THE MATTER OF A.D.,
a minor.

_____

Submitted May 29, 2025 – Decided June 6, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0038-23.

Illya D. Lichtenberg, attorney for appellant.

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney

General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant V.S.[1] appeals from the April 20, 2023 Family Part order finding he sexually abused his adopted daughter, A.D., beginning when she was ten years old, and she was an abused or neglected child pursuant to N.J.S.A. 9:6-8.21(c)(3). We affirm.

A.D. was born in March 2005. Defendant, A.D.'s biological cousin, adopted her in 2008 when she was two years old after her biological parents' rights were terminated. On August 4, 2022, the New Jersey Division of Child Protection and Permanency (Division) received a referral from two anonymous callers reporting defendant had been sexually abusing A.D., who was then seventeen years old, since she was ten years old. The same day, Division family service specialist intake worker Wendy Jean-Baptiste met with A.D., who confirmed the reported abuse.

---

[1] We use initials to protect the victim or alleged victim of sexual offenses. R. 1:38-3(d)(10).

The Division substantiated A.D.'s claims of sexual abuse. On August 5, it implemented a safety protection plan and removed A.D. from defendant's home. On August 22, the Division obtained custody of A.D. and subsequently arranged for a long-term familial resource placement.

The court scheduled a fact-finding hearing to begin on January 20, 2023. At defendant's request it was adjourned to February 24. On February 23, defendant filed a motion to dismiss. He argued "the statute [Title Nine] is intended to only protect the child until the age of [eighteen]," and "three weeks from today, [A.D.] will turn [eighteen]." "[T]his [c]ourt's jurisdiction ends three weeks from today[,] and this issue is moot."

On February 24, the court denied defendant's motion. It determined defendant's "focus . . . on the fact that she turns [eighteen] in three weeks" was "misplaced" because the fact-finding "is to determine whether or not [A.D.] was an abused or neglected child at the time the incident occurred." It found "[t]he purpose of Title [Nine] is not to necessarily and only to protect a child." "[A.D.] has the opportunity and the right to be heard. The Division has the opportunity and the right to be heard."

The court conducted a two-day fact-finding on February 24 and March 24, 2023. The Division presented Jean-Baptiste as its only witness. The Law

Guardian presented A.D. and her friend, T.F. Defendant testified and presented his current wife, D.C.

Jean-Baptiste testified that she interviewed defendant and A.D. on August 4, 2022. Defendant "indicated that he believed . . . the allegations were concerning [A.D.'s] conflict in the home with [D.C.], [who] is his second wife," and A.D. was "presenting with anger issues in the home."

A.D. "indicated that the sexual abuse acts had been going on since the age of [ten], at the hand of [defendant], while in the home." "She gave descriptive information with regard to the sexual acts or the sexual abuse by [defendant]. She also disclosed . . . she had witnessed [defendant] hit [D.C.] in the home, in her presence."

A.D. was referred to the Regional Diagnostic and Treatment Center (RDTC) for medical and psycho-social evaluations. She provided consistent reports of the alleged abuse during those evaluations. She reported "the abuse had been ongoing since the age of [ten,] and she recalled . . . over [thirty-five] . . . incidents . . . where [defendant] abused her sexually." The last reported incident occurred "on July 29[, 2022], [when] she came home on a break from a summer program." Defendant "called [her] into the living room of

4

the home, asked her to watch a movie with him[,] and . . . proceeded to try to fondle her."

A.D. "did not report . . . penetration, however, she did report contact between her vaginal parts and [defendant's] genital parts." "[S]he gave descriptive details in regards to her reports of how she was made to perform oral sex on [defendant] and [how] he also made her perform oral sex on him." She recalled "the oral sex" occurred "at least four times."

A.D. did not report the abuse earlier "because [defendant] . . . advised her that if she did disclose, it would ruin the family. He also reminded her that he had been raising her since the age of two." She previously "disclosed what was happening to her to family members[ and] to neighbors and . . . was told . . . not to tell anyone, due to fear of [defendant] getting in trouble." She eventually disclosed the abuse in August 2022 while she was away at a summer program after "she . . . received a text message from [defendant] indicating . . . that he missed her, that he could[ not] wait for her to return home so that they could continue . . . what he was doing to her."

The RDTC medical evaluation "did not reveal any residual findings due to inappropriate sexual contact, nor would any necessarily be expected given the history provided." The RDTC psychological testing indicated A.D. did "not

perceive herself to be experiencing any trauma symptoms at a clinically significant level," or "any emotional or behavioral difficulties." Her responses did indicate "she experiences internalizing behaviors such as feelings of hopelessness, sadness, and worry." She was diagnosed with "[o]ther specified trauma or stressor-related disorder" and individual trauma-focused therapy "to address and help her process the sexual abuse by her adoptive father" was recommended.

The Division "substantiated the sexual abuse allegation" based on "the descriptive reports that [A.D.] provided, as well as the consistency of her reports" to RDTC, the Division, law enforcement, and medical providers.

A.D. testified defendant began sexually abusing her at age ten after her mother moved to West Africa and defendant's first wife left the home. "[A]t first, it was . . . long hugs. Then it was kind of kiss[ing her] lips[ and] touching [her] breasts . . . ." "After that, there was[ not] even . . . long hugs [any]more. It was just straight to trying to touch [her] . . . breasts and her vagina." He would "take [her] hand and . . . put it up and down on his penis," and she "would . . . keep doing it until something came out, like something white."

In "[eighth g]rade" when she "was [thirteen] . . . he started oral on [her]." "[H]e would put his mouth on [her] vagina." He would also "push [her] head

down on his penis" and she would "not stop until something white came out." "Most of the time" they were not wearing clothes when the abuse occurred. The sexual abuse almost always occurred in defendant's room.

Defendant told her "not to tell anyone about the sexual abuse." A.D. did tell people defendant was sexually abusing her, but no one tried to help. "Some [were] like, just call the police, . . . just let somebody know. Some [were] just like, bear through it until you[ are eighteen]."

Defendant "comment[ed] on [her] virginity" and asked if she was "still a virgin." On one occasion when A.D. went to her pediatrician, defendant insisted on speaking with the doctor. He did not realize he was on speaker phone and said, "you[ have] done this for me before. Can you please check if she[ is] a virgin?" A.D. believed defendant was going to "penetrate[]" her if she was not a virgin. She knew "that he thought of penetrating" her because he once "thought about it . . . [and t]hen he literally said, no, you[ are] a virgin. So [she] knew if [she] was[ not] a virgin . . . he was going to penetrate [her]."

Once she realized "what [defendant] was doing was sexual abuse," she became "very distant. . . . [S]he started going out more and most of the time . . . [she] had these little jobs and [she] would just go work[]." She felt

> really disappointed and stuck . . . because imagine
> somebody that raise[s] you as a father, . . . you love

7

them. Like literally, if it was[ not] for that, [she] probably would have told somebody earlier but that[ is] what made [her] stay there . . . and . . . stick it out, hoping that . . . he would just stop this.

In eighth grade, A.D. told T.F. defendant was sexually abusing her. They "ma[d]e up a code word[,] . . . 'coffee[,]'" that A.D. would send T.F. "so she [could] know . . . [defendant] was about to sexually abuse [her]." T.F. "was supposed to come to [her] house or call [her]" to stop the abuse. T.F. "lived close, so she [could] just walk" to A.D.'s house. After receiving the code word, T.F. would "sometimes . . . call[. S]ometimes she would come over. . . . [S]he would be calling [A.D.] on her way to [her] house." A number of messages between A.D. and T.F. using the code word were entered in evidence. On each occasion she used the code word, defendant was about to sexually abuse her, and she was asking T.F. to help by calling her or coming to her house to stop the abuse.

He stopped sexually abusing her when A.D. "turned [fourteen]" and "finally knew . . . what he was doing was actually sexual assault." After that, "[she] started fighting [with] him more." "[T]he summer in the year of [ninth] grade[,] . . . he stopped . . . until March 2020, when the pandemic first happened, [and] he went to Africa."

In April 2020, defendant "came back with" D.C. A.D. believed D.C.'s presence was "protecting" her because defendant's "excuse[ to sexually abuse her] has always been his wife [was] not here and [D.C.] was finally here to . . . please him." He did not sexually abuse her again until July 2022 when D.C. began working overnight.

During the summer of 2022, A.D. was participating in a "pre-college program" at a college in New Jersey. She lived in a dormitory at the school Sunday afternoon through Friday afternoon and stayed with defendant Friday and Saturday nights.

Defendant last sexually assaulted her on July 29, 2022, while she was at home for the weekend. She was at a friend's house and defendant "called [her] to come home because it was late, it was [ten] o'clock." She "came home and . . . he kept telling [her] to watch this movie with him[,] but . . . [she] did[ not] want to watch the movie" because "it[ was] an action movie." "Then, he was clocking what time [she] was [going] to take a shower . . . ." "[E]ventually, [she] let him know [she was going to take a shower] and . . . he" said, "wait, let me take [a] shower first." He showered and told her to "go take [a] shower." A.D. showered and then went to her room.

9

Defendant "called [her] verbally first and then eventually, he called [her] on the phone" at "about 12:00 [a.m.]" She answered and defendant told her to come in the living room. When she "got in the living room[,] . . . [defendant] was sitting in the middle couch." No one else was in the room because "the same night" D.C. "started an overnight job," and defendant's mother was asleep in her room. Defendant was "telling [her] to come next to him, [but] she did [not] want to come next to him." "So[,] . . . he came to the couch [she] was sitting on . . . ."

She began "fighting [with] him," and defendant "kept talking about . . . how [she] fought him more now than [she] used to before." He told her "to lean on him" and "took his hand and . . . was . . . press[ing] it up on [her] upper body to lean on his lap," but she "was[ not] budging."

A.D. "calmed down" and "tr[ied] to not be resistant." Defendant "made a remark about [her] lip because his fingers were on [her] lip. He was like, it[ is] soft, then he tried to kiss [her], mouth to mouth contact." "[A]ll this [was] happening while [she was] laying down on his lap." Defendant then tried "to touch . . . [her] breast and [her] vagina but [she] was[ not] budging . . . . The only thing he was able to successfully do that night was to suck [her] left breast

10

and that was over clothing." "Eventually, he went back to the couch he was originally sitting on." A.D. went to her room and called T.F.

She returned to the summer program on Sunday, July 31. After she returned, defendant called her and said "he misse[d her], he can[ not] wait to see [her]. He [is] going to buy a lot of stuff for [her] for school . . . ." A.D. did not trust him and believed he would continue sexually abusing her because

> [o]ne[,] . . . this is a history. He has been doing this since [she] was [ten]. Two, the night . . . this happened, [she] remember[s] him saying . . . he can[ not] do anything to [her], like penetrating-wise, because [she was] under [eighteen]. So[, she] was going to turn [eighteen], it was only August, it was soon that [she] was going to turn [eighteen] . . . . Like, the new story would have been that [she] got raped or something.

A.D. reported the sexual abuse to her resident assistant, who reported the abuse to the Division.

T.F. testified she and A.D. were neighbors and went to the same school since kindergarten. In eighth grade, A.D. told her "her dad was sexually abusing her." They developed a code word, "coffee," that "[A.D.] would send . . . to [T.F.] when her dad was sexually abusing her." When she received the code word, T.F. "was supposed to run over to her house and sit in the living room . . . to stop her dad from sexually abusing her." "Sometimes, [A.D.] would

11

just send the word, '[c]offee,' or she would say, '[c]offee is about to burn.'"  She would send the code word "on Instagram, [or] sometimes [in] a text message."

They stopped using the code word around their "sophomore year of high school."  T.F. testified A.D. also stopped sharing details of the sexual abuse "when quarantine happened" in approximately "December of 2020."

The fact-finding resumed on March 24.  Defendant renewed his motion to dismiss because A.D. turned eighteen a week earlier.  He argued "the issue is, in effect, moot because Tittle [Nine] no longer applies to her because she is over the age of [eighteen]," and "the [c]ourt has lost jurisdiction over the matter." The court denied the motion for the reasons set forth on February 24.

D.C. testified she came to the United States from Guinea two years earlier after she and defendant married.  She "consider[ed A.D. her] daughter" and treated her "the same way [she] would treat [her] daughter."  But they "d[id not] get along.  When [D.C.] ask[ed] her to do something[, A.D.] would[ not] listen to [her] so[, she] would say [their] relationship was[ not] great."  "[T]here was tension in the household" because A.D. "kind of disliked [her]" and they were "hav[ing] trouble getting along."  She "always complained that [D.C. and defendant were] kind of bothering her, talking to her, and [they] would not leave her alone.  She . . . threatened to leave."

12

Defendant considered A.D. "as his own daughter[,] and [A.D.] . . . look[ed] upon him for a father."  "[I]n [her] opinion, the relationship [between A.D. and defendant was] good because [she] just trust[s her] husband."  "[T]heir relationship [was] only about . . . father and daughter and daughter and father."  She "could not believe . . . and [she] do[es] not believe" defendant sexually abused A.D. because "God forbids that."

She testified "the African community in Newark" does not "condone oral sex" and "as far as [her] tradition is concerned, that is . . . unaccepted."  She was "not aware" if defendant "ever perform[ed] oral sex on anyone."  On one occasion, she observed A.D. watching "a man and a female engaging in sexual conduct" on her computer, which she described as "pornography."

D.C. worked overnight from 6:00 p.m. to 6:30 a.m.  During the last week of July 2022, she worked overnight from Friday evening until Saturday morning.

Defendant testified he has been in the United States since 2004 or 2005.  A.D.'s mother called him shortly after A.D. was born and asked him to care for her.  He adopted A.D. when she was two years old.

There was tension in the household between A.D. and D.C.  "[D.C.] would tell [A.D.], [and] she would[ not] listen.  Like, hey, [D.C.] just want[ed] to teach [her] how to do this, how to do that, how to cook, and how to clean, how to take

care of [herself] in case [she] got married tomorrow . . . ."  A.D. was "disrespectful to [her]."

In July 2022, A.D. asked him for money to go to an amusement park, and he refused.  Defendant believes that was "part of" the reason she made the allegations of sexual abuse.  It was "[t]hat and one thing she always [said] was that [he] was enriching [himself] out of her, that [he was] getting a lot of money from . . . the system[] for her and . . . not giving her the money."  "And, again, . . . she did[ not] like [D.C.]"  A.D. "was very angry, she wanted to leave."

Defendant sent A.D. to the pediatrician because in "the country [he] came from . . . anything pertaining to female . . . a male cannot address," and he was "uncomfortable discussing anything sexual with [his] daughter."  Defendant found A.D. crying and she told him "she had a boyfriend in school" who "let her down."  He "said, okay, you know what, go to the doctor again . . . and they [can] check if there[ is] anything wrong, or anything going through you and this boy."

Defendant's mother lives with him.  In 2022, they lived in a three-bedroom apartment and his mother was around the house almost all of the time.  His mother was "always angry" because A.D. refused to pray.  "[T]hat was the problem between [A.D.] and [his] mom . . . ."

Defendant testified he has never performed oral sex on a woman. "[C]ulturally . . . that is something [he] do[es not] do . . . ."

On April 20, 2023, the court entered an order finding defendant sexually abused A.D., supported by an oral opinion. The court also issued a written opinion supplementing its February 24, 2023 oral opinion denying defendant's motion to dismiss.

In its supplemental opinion, the court found defendant's contention the court lost jurisdiction when A.D. turned eighteen was incorrect. N.J.S.A. 9:6-8.24(b), expressly provides,"[i]n determining the jurisdiction of the court under [Title Nine], the age of the child at the time the proceedings are initiated is controlling." Because this case was initiated when A.D. was under eighteen, the court retained jurisdiction after she turned eighteen.

The court concluded N.J. Division of Youth and Family Services v. W.F., 434 N.J. Super. 288 (App. Div. 2014), upon which defendant relied, is "entirely distinguishable." It noted W.F. "specifically dealt with custody of children" and after the individual turned eighteen "[t]he matter was rendered moot" because "the remedy being asked for was something the court was wholly unable to grant." In this case, unlike the issue of custody in W.F., the issue of whether defendant sexually abused A.D. when she was a child is not moot.

15

The court found the Division proved by a preponderance of the credible evidence defendant sexually abused A.D. It found A.D. was credible because "[s]he testified consistently with her prior statements. . . . She appeared nervous and emotionally distraught at times, which is expected under the circumstances. The [c]ourt found her testimony reasonable and not forced." The court also determined Jean-Baptiste and T.F. were credible witnesses.

It concluded defendant's "testimony overall was inauthentic and not credible. He simply dismissed details without explanation. He relied on generalities rather than providing a reasonable explanation for the allegations. His testimony was clearly self-serving, as the consequences of a finding against him are so significant." "His testimony was [also] devoid of any explanations other than he could not have possibly ha[d] oral sex with [A.D.] because of his culture."

The court did not find D.C. credible because

> [s]he acknowledged details that were not in her husband's favor but only after being very evasive. She appeared as someone who believed that her husband could do nothing wrong and seemed to either blindly believe this or testified in a manner to discredit [A.D.] in favor of [defendant]. Her overall testimony was biased.

A-2873-22

It found

> there was sufficient corroboration of [A.D.'s] hearsay statements by her own testimony, the testimony of T.F., [D.C.], [defendant] himself[,] and the texts and Instagram messages. Following the fact[-]finding hearing, the [c]ourt having heard the testimony of the witnesses and the exhibits being admitted, based upon the totality of the evidence, the [c]ourt hereby determines that the Division has met its burden of proving by a preponderance of the credible and material evidence that [A.D.] is an abused or neglected child pursuant to N.J.S.A. 9:6-8.21(c)(3).

A.D.'s testimony "remain[ed] consistent with her disclosures to the Division, police[,] and [RDTC] staff. Her disclosures of specific instances were detailed. T.F. corroborated their use of [a] code word, as well as periods of time that the abuse subsided."

The court was not persuaded by defendant's argument, "[A.D.'s] ulterior motives for her disclosures were unexplained benefits from the Division and a conflict between [A.D.] and [D.C.]." The court rejected these claims in part because "[A.D.] and T.F.'s use of the code word, '[c]offee,' predated the referral by several years and well before [D.C.] came to the United States."

D.C.'s testimony "actually corroborated [A.D.'s] disclosure of the late July 2022 incident[,] and she acknowledged that she works overnights on Fridays and Saturdays. [Defendant] corroborated [A.D.'s] testimony regarding her going to

17

the doctor and being checked." "This is not a one-time act that could be subject to misunderstanding. This is a series of acts over the course of seven years."

> There was credible and corroborated evidence that the abuse began when [A.D.] was ten years old, subsided when [defendant] was out of the country[,] and did not resume until [D.C.] was working overnight in July of 2022. [A.D.'s] recollection of details over the years of abuse did not waver, despite the number of times she recounted them.

On appeal, defendant argues "the action was moot and/or a waste of judicial resources as the child/adult no longer qualified for the protection of the court." Specifically, he contends the court "overlooked the qualifying condition in N.J.S.A. 9:6-8.8(1)(a)" that states "[t]he purpose of this act is to provide for the protection of children under [eighteen] years of age." He asserts "[t]he focus on protection aims to prevent future harm to children under [eighteen], rather than addressing past injuries except where they indicate potential future events." Because there was no risk of future harm to A.D. as a child, the court lacked jurisdiction.

Defendant also argues the court "'cherry picked' facts to support its conclusion[,] disregarding and making no reference to competing facts." Finally, he "urges" us to "adopt a modified version of the Silver v. Silver[2] test

---

[2] 387 N.J. Super. 112 (App. Div. 2006).

for determining whether to proceed in Title [Nine] actions for juveniles who have become or are about to become adults."

Our review of a family court's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). We must determine whether the decision "is supported by 'substantial and credible evidence.'" N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)). We defer to the Family Part's factual findings, because that court "has the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." Ibid.

A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). The court's interpretation of the law or its legal conclusions are reviewed de novo. State in the Int. of A.B., 219 N.J. 542, 554-55 (2014).

"Title [Nine] controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). "The purpose animating Title Nine 'is to provide for the protection of children . . . who have had serious injury inflicted upon

them.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 31 (2011) (quoting N.J.S.A. 9:6-8.8(a)).  The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'"  Id. at 32 (quoting N.J.S.A. 9:6-8.46(b)).

N.J.S.A. 9:6-8.21(c)(3) provides "'[a]bused or neglected child' means a child less than [eighteen] years of age whose parent or guardian, as herein defined, . . . commits or allows to be committed an act of sexual abuse against the child."  "'Sexual abuse'" is defined as "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person."  N.J.S.A. 9:6-8.84.  It includes "the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct;" as well as "sexual penetration and sexual contact as defined in N.J.S.[A.] 2C:14-1 and a prohibited sexual act as defined in N.J.S.[A.] 2C:24-4."  N.J.S.A. 9:6-8.84(a), (c).

We affirm substantially for the reasons set forth in the court's oral and written opinions.  We add the following comments.

The court correctly determined it was not divested of jurisdiction when A.D. turned eighteen. N.J.S.A. 9:6-8.24(b) expressly provides "[i]n determining the jurisdiction" over proceedings under Title Nine, "the age of the child at the time the proceedings are initiated is controlling." In this case, the proceedings were initiated when A.D. was seventeen, and the court properly exercised jurisdiction after she turned eighteen.

We are not persuaded by defendant's claim the court "overlooked" N.J.S.A. 9:6-8.8(a), which states "[t]he purpose of [Title Nine] is to provide for the protection of children under [eighteen] years of age." "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)). "We ascribe to the statutory words their ordinary meaning . . . and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (internal citations omitted). "If the plain language leads to a clear and unambiguous result, then our interpretive process is over." Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007).

"A court may turn to a statute's preamble as an aid in determining legislative intent." DiProspero, 183 N.J. at 496 (citing Bass v. Allen Home

21

Improvement Co., 8 N.J. 219, 225 (1951)). "The preamble, however, should be read in harmony with the statute that it introduces, whenever possible." Ibid. "To the extent that the preamble is at variance with the clear and unambiguous language of the statute, the preamble must give way." Id. at 497 (citing State v. Mundet Cork Corp., 8 N.J. 359, 366 (1952)).

In this case, the Legislature clearly and unambiguously provided the court's jurisdiction over Title Nine proceedings is determined by the age of the child at the time the proceedings are initiated. Necessarily, this means jurisdiction is not terminated when the child turns eighteen. To the extent the preamble to the statute set forth in N.J.S.A. 9:6-8.8(a) can be construed to mean otherwise, that interpretation must "give way" to the express grant of jurisdiction set forth in N.J.S.A. 9:6-8.24(b). See ibid.

We are unconvinced by defendant's claim the action became moot because A.D. turned eighteen. "[C]ourts of this state do not resolve issues that have become moot due to the passage of time or intervening events." State v. Davila, 443 N.J. Super. 577, 584 (App. Div. 2016) (alteration in original) (quoting City of Camden v. Whitman, 325 N.J. Super. 236, 243 (App. Div. 1999)). An issue is considered "moot when our decision . . . can have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104 (2015) (quoting

22

Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011)).

In this case, the court was asked to determine whether defendant sexually abused A.D. when she was a child. That issue did not become moot when A.D. turned eighteen. Moreover, the Division's interest in protecting children extends beyond any individual victim of sexual abuse and continues after a particular victim turns eighteen. For example, a finding of sexual abuse triggers reporting requirements to local police, N.J.S.A. 9:6-8.10a(e), and inclusion on the child abuse registry, N.J.S.A. 9:6-8.11, which is used by certain employers to ensure a safe environment for children. A person found to have committed an act of sexual abuse may also be precluded from serving as a resource parent, N.J.S.A. 30:4C-27.7, or kinship legal guardian, N.J.S.A. 30:4C-86, or from adopting a child, N.J.S.A. 9:3-54.2.

The court correctly determined defendant's reliance on W.F. was misplaced. In that case, we determined "the issue of custody of the . . . children became moot when they turned eighteen[]years old." W.F., 434 N.J. at 296. We concluded "[w]e cannot grant effective relief because we cannot award . . . custody of . . . adult children." Id. at 297. "[A] ruling on how their custody should have been determined . . . is moot because it 'can have no

practical effect on the existing controversy.'" Ibid. (quoting N.J. Div. of Youth and Fam. Servs. v. J.C., 423 N.J. Super. 259, 263 (App. Div. 2011)). In this case, unlike in W.F., the question of whether defendant sexually abused A.D. as a child was not moot for all the reasons discussed previously.

We do not perceive any basis to disturb the court's finding defendant sexually abused A.D. and she was an abused or neglected child. The court's decision is supported by substantial credible evidence in the record, including A.D.'s consistent testimony, T.F.'s testimony that A.D. disclosed the abuse to her years earlier, and the messages between A.D. and T.F. corroborating their testimony they had a code word A.D. would send when defendant was about to sexually abuse her. We defer to the court's findings, particularly because it had the ability to see the witnesses and gauge their credibility.

We find no merit in defendant's claim the court "cherry picked" facts and "disregarded . . . competing facts." We are satisfied the court engaged in a comprehensive analysis of the testimony and documentary evidence. There is no basis to conclude the court failed to consider any relevant evidence in reaching its decision.

A-2873-22

To the extent we have not addressed any of defendant's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

25